STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. FREDERICK BENJAMIN THOMPSON, DEFENDANT-AP-PELLANT.

Argued March 8, 1971—Decided November 8, 1971.

400

Mr. *Edward F. Kent* argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

Mr. *Charles M. Egan, Jr.,* Morris County Prosecutor, argued the cause for respondent (*Mr. Donald G. Collester, Jr.,* Assistant Prosecutor, of counsel and on the brief; *Mr. Charles M. Egan, Jr.,* attorney).

The opinion of the Court was delivered by

FRANCIS, J. The Grand Jury of Morris County indicted defendant Frederick Thompson for the murder of Dorothy Palmer on Friday, September 29, 1967, in Harding Township of that county. At a jury trial which concluded on November 21, 1968, Thompson was convicted of murder in the first degree. The jury made no recommendation of life imprisonment, and, therefore, pursuant to the statutory mandate, the trial court imposed the death penalty. *N. J. S. A.* 2A:113–4. Direct appeal followed in due course. *R.* 2:2–1(a)(3).

The case was argued some time ago and under ordinary circumstances would have been decided at an earlier date. However, defendant raised certain constitutional questions the resolution of which depends upon the outcome of a number of appeals pending in the United States Supreme Court, and certain other appeals which are to be reargued in this Court. Since vacancies in the United States Supreme Court make it unlikely the decisions therein will be forthcoming for some time, we have concluded that all aspects of this appeal should be disposed of now, reserving only those issues which must await action there or reargument in this Court.

## I

Prior to her death the decedent Dorothy Palmer and her husband H. Bruce Palmer resided in a ranch type, one-family dwelling situated in a sparsely populated residential area on Blue Mill Road, Harding Township, a short distance outside of the Town of Morristown. The main entrance is located in the center of the house and opens into a large foyer behind which is a sizeable combination living room-dining room. The right wing of the house consists principally of Mr. Palmer's bedroom in the front, Mrs. Palmer's bedroom in the rear, with a connecting bath between the two. The left wing contains the kitchen, a utility or laundry area, a family room or den and a spare bedroom or guest room. For some time prior to the killing the Palmers lived alone in the house; their children had married and moved elsewhere.

The Palmers also maintained an apartment in New York City, and they had been occupying it earlier in the week of September 29. On Thursday, September 28, Mr. Palmer left for a business conference in Massachusetts, and Mrs. Palmer returned alone to their Harding Township home.

The defendant Thompson knew the Palmer property. In 1964 or 1965 while in the employ of a tree expert he worked on the trees there on several occasions. Mr. Palmer had conversed with Thompson on at least one occasion and knew him well enough to identify him at the trial.

Thompson was paroled from a Connecticut prison on September 27, 1967. His parole officer had found a job for him in Bridgeport, Connecticut, to commence on September 28. Thompson talked with the prospective employer on the day of his release and arranged to report for work the following morning. He appeared as directed, but said he had some personal business to take care of and would come in the next day, September 29. However, he did not appear and the prospective employer never heard from him again.

On September 28 Thompson came to New Jersey. Around noon of that day he visited a shop in Paterson which was operated by Fred Salonen. His purpose was to sell some sketches he had made. Salonen knew Thompson because he had visited the store on earlier occasions, but he did not buy any of the sketches on this occasion. It was apparent that Salonen was acquainted with Thompson's wife also because Thompson inquired as to whether he had seen her. At the prosecutor's request Salonen pointed out Thompson in the courtroom.

An Erie-Lackawanna railroad conductor positively identified Thompson as a person he had seen board his train at East Orange in the early morning of September 29, and alight at Morristown at 1:27 A.M. The conductor knew the passengers who generally used his train on that early morning hour run, and Thompson being a new face was particularly noticed by him.

Shortly before 9 A.M. on September 29, Mrs. Palmer drove to Madison and picked up Mrs. Mary Venneri who did house-cleaning for her one day a week. At about 9:05 A.M. they came back to the Palmer house, entered the garage in the left wing and went upstairs into the foyer. After giving instructions to Mrs. Venneri about her duties for the day, Mrs. Palmer went off in the direction of her bedroom and Mrs. Venneri went to the laundry room to prepare for the work. There she noticed some leaves and peat moss on the floor and began to pick them up. While doing so she heard a sound like a sigh and ran into the guest room. From there she saw Mrs. Palmer on the floor in the foyer with a man about six feet two inches tall standing over her holding a knife in his right hand. She said it was light in the foyer although it was raining outside. She described the man as being dressed in dark clothes, and although she testified she would never forget his face "as long as [she] lives," and that his complexion was "light," it seems plain that she was not certain on the scene whether he was white or black. Thompson is a Negro of fairly light com-

plexion. It appears that five or six days after the murder when Mrs. Venneri identified Thompson as the killer from some photographs of whites and blacks, she did not know then whether he was white or black. However, at the trial she left the witness stand and identified him, saying there was no question that he was the man.

Mrs. Venneri testified that when she came upon the scene the man holding the knife said "Don't move. I'll kill you next." But she screamed and ran out of the back door calling for help. A passing female motorist picked her up. The motorist, Mrs. Ellen S. Fearon, testified that Mrs. Venneri was "hysterical" in describing what was going on in the Palmer house, and on reaching the nearest telephone they called the police, who asked that they return to the Palmer driveway. The police arrived at 9:24 A.M. and on entering the house found Mrs. Palmer face down in the foyer. No sign of breathing or pulse was detected but one officer called an ambulance and a doctor, and then turned the body over in order to apply a resuscitator. There was a can of "Rebuff," a mace type repellant, in Mrs. Palmer's right hand. This was removed and shortly thereafter some photographs of the body were taken.

Police examination of the house revealed a ground level window in Mr. Palmer's bedroom had been pushed in and its screen ripped. Inside on the floor there were broken glass and pieces of wood from the window; also particles of mud and peat moss had been tracked across the room. In Mrs. Palmer's bedroom "scuff marks," traces of mud on pieces of furniture, and a half string of pearls were found. The other half of the string of pearls was under the body in the foyer. Blood was noted on the wood molding in the small alcove of Mrs. Palmer's bedroom. A footprint was seen on the bathroom rug, and a photograph taken of it was admitted in evidence over defendant's objection.

A State Trooper observed spots on the foyer wall which proved to be Rebuff. On the day after the murder, another trooper found a pocketbook in a wooded area near the Pal-

mer house. It was identified by Mr. Palmer as belonging to his wife. It contained several items belonging to her, but no money, and the small billfold in which she ordinarily carried her money was never found. A chemist who examined the pocketbook around October 6 found stains of Rebuff on both the inside and outside of it. He testified that the vapor was projected from the can by deflecting a button located on the top, and he gave the opinion over objection that the stains on the inside of the pocketbook had been caused by discharge within that area and that the discharge had occurred fairly recently. On cross-examination he expressed the opinion that the Rebuff spray had been released by "someone taking it out of the pocketbook." He noted also that the can had human blood on the outside surface.

Mrs. Palmer's body was removed and later in the day an autopsy was performed. The examining physician found 25 lacerations over the entire body, including the left hand and arm, the chest, one ankle, the back and shoulder blades, the neck and one thigh. The cause of death was "a bilateral pneumothorax and hemorrhage from lacerations of the abdominal aorta * * * due to knife wounds."

Commencing on the day of the murder and lasting for about six days, an intensive search for the killer was carried on. One hundred fifty to 200 men were involved and the effort was largely directed toward the nearby "Great Swamp." Helicopters were utilized but the search proved unproductive.

For reasons that need not be detailed, since they were not disclosed in the presence of the jury, suspicion began to point to Thompson and investigation revealed that he had spent three days between September 28 and October 4 in a Newark rooming house. The police located Mrs. Joyce Ferrell, defendant's sister-in-law. She and her sister, defendant's wife, are white. Mrs. Ferrell testified to the substance of some telephone calls she received from Thompson before and after the murder. Thompson called her on September 27 inquiring as to the whereabouts of his wife; she said

she did not know. On Monday, October 2, and Wednesday, October 4, he again phoned from Newark seeking information about his wife. Then he called her on October 6, by which time he had been identified in the newspapers as a suspect. Mrs. Ferrell related that conversation, and because it was an important element of the State's proof, and its admission in evidence a ground of appeal, we set it forth:

A. Well, the telephone rang and I picked it up and he said, 'Hello,' and I said, 'Ben,' I said, 'Where in the world are you?' and he said, 'Wouldn't you and everybody else like to know,' so he said, 'Did you see the paper?' and I said to him, 'Did I see the paper?'

I said, 'I hope to tell you I saw the paper,' and I said to him, I said, 'You didn't do that, did you, Ben?' and he said to me, 'No comment.'

Q. Now, what paper? When you said, 'What paper, I hope to tell you what paper,' what paper had you seen?

A. The Star Ledger.

Q. What in the paper had you seen?

A. They had a picture of Ben in it and they were looking for Ben as a suspect for the murder of Mrs. Palmer.

Q. Did you then ask him any other question about anything that appeared in the paper or anything he had done? A. Well, as — when I said that I had seen the paper and all and I said to him, 'Ben, you didn't have to do that'—I said 'You didn't do that, did you?' and he said, 'No comment.'

I said, 'You couldn't have been that stupid.' I said, 'My God,' I said, 'you didn't have to kill her.'

I said, 'Why didn't you just hit her?—you would have knocked her right across the room.'

So he said to me, 'Well, it's just one of those things.'

Q. Was there any further conversation on that date about anything that you had seen in the paper, anything about any search or anything of that sort?

A. Yes, sir. As a matter of fact, he said something—I mean he said that apparently in one of the papers that he had — I don't know which one—he said they were crazy for something to do with the silk stocking, which I don't know anything about that.

Q. Was there anything else about where he had been?

A. I said to him, 'Gee, I said "you've been here in Newark and," I said, "they have been looking for you in the swamp and everything," and so he said to me, "Well, he said, 'I had some pretty close calls there. I will have to tell you about it sometime and also about the helicopters.' " '

\* \* \* \* \* \* \* \*

Q. Well, I mean what was said between you and him about helicopters? A. Well, the thing about the helicopter was, well, when he

said that he was—I said that 'they have been searching for you in the swamp, they were still looking for you all this time,' and he said to me, that he said—he said, 'I had some pretty close calls there I will have to tell you about,' and he laughed and he said, 'There were quite a few helicopters and that around also,' it was just in with the conversation on the swamp.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

A. Okay. I asked if there was any — if they had any clues or anything like this and he said, 'no', and I said to him,' Well, what about the pocketbook?' and he said 'Unh-Unh, no good,' and I said, 'Well, what about the mace?' and he said 'unh-unh, very little effect.' "

Around the middle of the next week he telephoned her to say he was leaving the State. A week later he called from St. Louis, again inquiring about his wife. Finally, on October 19, apparently upset at his failure to obtain information about his wife, he said in the course of another telephone call to Mrs. Ferrell that he was "going on a rampage, its going to be in New Jersey, and get back to where the trouble started in the first place." The next day she notified a State Trooper about the telephone calls. Thompson's apprehension followed.

At the trial which resulted in the death sentence, Thompson elected not to take the witness stand. Out of the presence of the jury and when not under oath or subject to cross-examination, he stated to the court, "I am innocent, but that in view of my past record, I elect not to take the stand." Of course, that self-serving statement has no probative force whatever as evidence on the issue of guilt or innocence.

On this appeal defendant raises a number of alleged trial errors and constitutional issues as bases for reversal of his conviction. We shall deal with all of them save those constitutional problems which, as indicated above, depend for resolution upon cases pending in the United States Supreme Court, or to be set down for reargument in this Court. No contention is made on this appeal that the jury finding of guilt of murder in the first degree was contrary to the weight of the evidence.

## II

The telephone conversations as detailed above, undoubtedly had considerable evidentiary significance on the issue of defendant's guilt. Defendant contends that his sister-in-law's statements or questions in the conversations contained inadmissible hearsay, and that his answers thereto — or comments thereon, particularly since many of them were evasive at best, do not qualify as "adoptive admissions" under Rule 63(8) or declarations against interest under Rule 63(10) of the Rules of Evidence. We see no merit in the claim.

The fact that the sister-in-law's statements or questions to Thompson referred to matters she had learned from newspaper accounts of the crime is not controlling. The circumstances that gave them legitimate life as evidence were his answers to or comments on the statements or questions put to him. Overall his answers or comments revealed a personal knowledge of events associated with the murder, and constituted either actual or inferential admissions or declarations against interest with respect to its commission by him.

The inculpatory nature of the conversations is inescapable when they are put in proper focus. The subject was introduced between them by defendant's inquiry as to whether she had seen the papers. The character of her answer — "I hope to tell you I saw the paper" and her question "you didn't do that, did you?" clearly imply that she was aware of the horrendous crime and that he was a suspect. His evasive "No comment" was not the kind of answer that might reasonably be expected from a person wholly unconnected with the crime. But, alone and of itself, its probative force might not be great. However, when Mrs. Ferrell said "My God, you didn't have to kill her," and "Why didn't you just hit her — you would have knocked her right across the room" his answer, "Well, it's just one of those things," if accepted by the jury, carried devastating

probative force as a declaration against interest — as an admission that he committed the crime.

The inculpatory significance of the admissions is heightened by additional references to and acknowledgment of facts which it might well be inferred only a guilty person would know. His acknowledgment that the finding of Mrs. Palmer's pocketbook by the police as a clue showed an awareness that the killer had taken a pocketbook. And his answer that the mace had "very little effect" points strongly to him as the attacker Mrs. Palmer tried desperately to ward off. Finally, his answers which revealed an awareness that a search for the killer was made in the Great Swamp, that helicopters were used, that he "had some pretty close calls there * * *" and that he would tell Mrs. Ferrell "about it some time," defy any characterization other than powerful declarations against interest.

 In our judgment Thompson's answers and statements considered in the context of Mrs. Ferrell's inquiries and comments have such incriminatory impact as to bring them well within Rule 63(10) of the Rules of Evidence. That rule says in part:

> A statement is admissible if at the time it was made it * * * so far subjected him to a * * * criminal liability * * * that a reasonable man in his position would not have made the statement unless he believed it to be true * * *.

The same may be said of Rule 63(8) which provides:

> A statement is admissible against a party * * * (b) if the party with knowledge of the content of the statement has, by words or other conduct, manifested his adoption of it or his belief in its truth.

The quoted conversation between Thompson and his sister-in-law, whether considered in its entirety or in its individual parts, clearly bespeaks an adoption by him of her references to the crime as factual. Moreover, his answers and com-

ments thereon in context indicate the kind of acknowledgment of their truth that would justify a jury in finding that they would be made only by the perpetrator of the crime. Their inconsistency with Thompson's plea of not guilty clearly gives them logical force against him. Compare, *Jacobs v. United States,* 395 *F.* 2d 469, 476 (8 Cir. 1968) ; *People v. Davis,* 43 *Cal.* 2d 661, 276 *P.* 2d 801, 805–807 (1954), *cert. den.* 349 *U. S.* 905, 75 *S. Ct.* 581, 99 *L. Ed.* 1241 (1955) ; *People v. Bernstein,* 171 *Cal. App.* 2d 279, 340 *P.* 2d 299 (App. Ct. 1959) ; *People v. Hurley,* 151 *Cal. App.* 2d 339, 311 *P.* 2d 49 (App. Ct. 1957) ; *Grace v. Commonwealth,* 302 *Ky.* 796, 196 *S. W.* 2d 417 (1946) ; *Patty v. State,* 242 *Ala.* 304, 6 *So.* 2d 399, 400 (1942), and see generally, 2 *Wharton, Criminal Evidence* § 400, p. 149 (12th Ed. Anderson, 1955) ; 4 *Wigmore, Evidence* § 1057a, p. 19 (3rd Ed. 1940).

█ Defendant centers much of his argument against admissibility of the conversations around a question and answer which occurred almost at the outset of his discussion with Mrs. Ferrell. She said "You didn't do that, did you Ben?" and he replied "No comment." Obviously that evasive answer, which is not even a denial of the killing, in light of the remainder of the conversation, cannot be deemed to detract to any substantial extent from the probative force of the entire colloquy. It is reasonable to regard such equivocal or evasive responses to questions of that import in the context then present as in the nature of tacit admissions. 2 *Wharton, supra,* § 406, p. 158; *McCormick, Evidence* § 247b, p. 528 (1954). In the total exchange, Thompson's evasive statement provided more reliable inculpatory evidence than would have been furnished by silence because certainly there was no barrier between him and Mrs. Ferrell in the way of a directly responsive answer to the question. Note, "Tacit Criminal Admissions," 112 *U. Pa. L. Rev.* 210, 226 (1963).

Pursuing the subject further, defendant urges that the trial court erred in failing to give to the jury the requested

cautionary instruction as to the nature of their consideration of the telephone conversations. The request was couched in the following general language:

All evidence relating to any oral admission or other incriminatory statement or act claimed to have been made or done by a defendant outside of court should always be considered with caution and weighed with great care.

The trial court charged the jury clearly and in detail as to the presumption of innocence of the defendant and on the burden resting upon the State to establish guilt beyond a reasonable doubt which, too, was adequately defined. Instruction was given as to the obligation of the jury to decide the credibility of the respective witnesses, and they were told that the issue of credibility did not depend upon the number of witnesses who appeared for the State or for the defendant, that it must be decided on the basis of the quality, the worthiness and the truthfulness of their testimony. And they were advised also that unless the proof introduced by the State satisfied them beyond a reasonable doubt — which was defined in understandable terms — of the defendant's guilt, they should acquit him.

It is true that the defendant's requested instruction was not given to the jury in the language handed to the court. The claim now is that although not specifically directed to the telephone conversations between defendant and Mrs. Ferrell, it did set forth the general test to be applied by a jury in evaluating all evidence of any out of court admissions and, therefore, the jury should have been made aware of it. It is fundamental that a trial court is not bound to instruct a jury in the language requested by a party. If the subject matter is adequately covered in the text and purport of the whole charge, no prejudicial error comes into existence.

Here, in the course of the charge the court specifically referred to Mrs. Ferrell's testimony and commented on it

in the terms of defendant's sharp attack upon it in cross-examination and in summation. The judge said:

Then of course you have the testimony of Mrs. Ferrell. What weight you want to give her testimony, whether her testimony was motivated by some revenge or some dislike because Mr. Thompson is a colored man and married her sister, that's for you to determine. You are the sole judges of this * * *.

It seems plain from the trial judge's comments upon the matter when defense counsel brought the request to charge to his attention, that he felt the issue of credibility of all witnesses, and particularly of Mrs. Ferrell, had been adequately covered. Our review of the entire charge persuades us that the jury was sufficiently informed of its function as trier of the facts, and that no prejudicial error resulted from the refusal to further instruct on the issue of credibility in the general terms proposed by defendant.

### III

Defendant argues that Mrs. Venneri's identification of the defendant during the investigation of the crime resulted from examination of certain impermissibly suggestive photographs of him which gave rise to a substantial likelihood of irreparable misidentification.

It appeared at the trial that five or six days after the murder, a detective called at her home and without any preliminary discussion or description of them, showed her seven photographs of white and black men. According to Mrs. Venneri, a detective laid out on a table the seven photographs, each one containing a profile and a full face view. After examination she identified two of them, in positions two and seven in the row, as being the man she saw at the scene of the killing. Both of them were photographs of the defendant Thompson. The two photographs had been taken more than two years apart, one in Newark and one in Connecticut. Thompson was dressed differently in each one; his hair is longer in one than the other; his eyes ap-

pear lighter in one than the other, and in the one taken in Newark his complexion is considerably lighter than the other. (Copies of the two photographs with certain markings removed were later received in evidence.) In commenting on defendant's criticism of the inclusion of two photographs of one man in the group of seven, the Court said:

"Although the pictures are of the same man they are not identically the same pictures. There is a dissimilarity in respect to the eyes, the profiles between one and the other; there is certainly nothing on here to indicate by any marking that they are the same person."

Mrs. Venneri testified also that between the time of the homicide and the day she examined the seven photographs no one had given her a description of any suspect or accused. She said she would remember defendant's face as long as she lived. It may be noted also that on the same day as the crime she had viewed a lineup at Police Headquarters, and rejected each of the persons as the killer.

This prearrest identification proof was taken out of the presence of the jury. At its conclusion defendant claimed that the inclusion of the two photographs of Thompson in the group of seven was so unduly suggestive and fundamentally unfair as to constitute a denial of due process, and so the identification evidence should be excluded. The trial court overruled the objection, and the jury was returned to the court room. Thereupon, although Mrs. Venneri had seen the photographs on only one occasion between October 5 and the trial, namely when she was before the Grand Jury, she left the witness box and unhesitatingly picked out Thompson, saying she was positive in her identification of him as the man who committed the crime in the Palmer home. Then on cross-examination defendant brought out the circumstances of the above described prearrest photographic identification which had been introduced by the State out of the presence of the jury. On this appeal defendant does not attack the in-court identification of defendant by Mrs. Venneri. In fact, his brief offers no criticism

whatever of its legal propriety. The sole ground for reversal on the identification aspect of the case is that inclusion of the two photographs of defendant in the group of seven laid before Mrs. Venneri in the early days of the investigation of the murder impermissibly suggested to her that she should identify Thompson as the killer.

■■ Photographic identification of a possible suspect of a crime during police investigation and before indictment is a permissible practice. Such identification will be denied admission in evidence at trial only if the procedure followed was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 *U. S.* 377, 384, 88 *S. Ct.* 967, 971, 19 *L. Ed.* 2d 1247, 1253 (1968); *State v. Edge,* 57 *N. J.* 580, 587 (1971); *State v. Royster,* 57 *N. J.* 472, 480–481 (1971); *State v. Mustacchio,* 57 *N. J.* 265, 274–276 (1970); *State v. Matlack,* 49 *N. J.* 491, 498–499, *cert. den.* 389 *U. S.* 1009, 88 *S. Ct.* 572, 19 *L. Ed.* 2d 606 (1967); *United States v. Butler,* 405 *F.* 2d 395, 396–397 (4 Cir. 1968), *cert. den.* 396 *U. S.* 853, 90 *S. Ct.* 114, 24 *L. Ed.* 2d 102 (1969). In our judgment the circumstances present in this case reveal no violation of that rule, and we are satisfied that the trial judge committed no legal error in ruling out of the presence of the jury that he would not exclude the photographic identification of defendant.

■ In addition, it cannot be overlooked that, as above noted, when the trial resumed in the presence of the jury the State did not reintroduce the photographic identification. Instead, when Mrs. Venneri returned to the witness stand, at the prosecutor's request she stepped down and firmly identified defendant in the courtroom as the perpetrator of the stabbings. Her testimony was clear and positive and we are satisfied that this in-court selection of defendant was unhesitating and unequivocal, and independent of and uninfluenced by the photographs she had seen a year earlier. No objection was made to the in-court identification on the ground that under the evidence it was based upon an

illegal out-of-court photographic identification. Nor, as we have said, is the in-court pointing out of Thompson alleged as error on this appeal. But, even assuming that defendant intended to argue by implication that the prearrest photographic procedure which resulted in the selection of Thompson was improperly suggestive, and its effect so pervasive that the in-court identification was clearly influenced thereby, in our judgment such implication lacks factual support. Our study of all the circumstances shown in the record satisfies us that the evidence of both prearrest and in-court identification of the defendant was properly admitted and submitted to the jury for ultimate evaluation. See *State v. Edge, supra,* 57 *N. J.* at 587; *State v. Royster, supra,* 57 *N. J.* at 480; *State v. Mustacchio, supra,* 57 *N. J.* at 274–276; *United States v. Cunningham,* 423 *F.* 2d 1269, 1271–1273 (4 Cir. 1970); *Joyner v. State,* 7 *Md. App.* 692, 257 *A.* 2d 444, 452–454 (Ct. Spec. App. 1969).

In *Simmons, supra,* where the United States Supreme Court approved the practice of pretrial identification by photographs unless the procedure used is impermissibly suggestive, this was said:

"Applying the standard to this case, we conclude that petitioner Simmons' claim on this score must fail. In the first place, it is not suggested that it was unnecessary for the FBI to resort to photographic identification in this instance. A serious felony had been committed. The perpetrators were still at large. The inconclusive clues which law enforcement officials possessed led to Andrews and Simmons. It was essential for the FBI agents swiftly to determine whether they were on the right track, so that they could properly deploy their forces in Chicago and, if necessary, alert officials in other cities." 390 *U. S.* at 384–385, 88 S. Ct. at 971, 19 *L. Ed.* 2d at 1253–1254.

The opinion discloses that the day after the bank robbery involved, the FBI showed at least six snapshots of Simmons, Andrews (two of the suspects), and others to five eyewitnesses to the crime. They were group pictures, with Simmons and Andrews appearing several times in the series. At

the trial the Government did not introduce any of the photographs, but relied upon the in-court identification by the five eyewitnesses. The Court found no error in the pre-arrest use of the photographs.

In *Cunningham, supra,* Cunningham and Dews were convicted of robbery. About three weeks after the robbery, and prior to any arrest, several eyewitnesses were shown 14 photographs. There were four color and one black and white photographs of Dews, two color and one black and white photographs of DeBruhl (a co-defendant), one color and one black and white photograph of Cunningham, and four black and white photographs of other individuals having no connection with the case. Less than half of those viewing the photographs identified Dews; four of seven identified Cunningham; of the four only three identified him at the trial. Only one of those who identified Cunningham testified to any reliance on the photographs, while the two witnesses who identified Dews at trial relied in part on prior photographic identification. It was held that under the circumstances use of the photographs was not impermissibly suggestive within the rule laid down in *Simmons.*

In *Butler, supra,* another robbery case, three days after the crime and before the defendant was in custody, a number of eyewitnesses were shown at least 13 photographs. Two of them were of Butler, and one of the two, unlike any of the other photographs shown to the witnesses, pictured him in a uniform with the letters "Spec. Pol." (special policeman) appearing on the front of it. Examination of the photograph of defendant in a uniform with the special lettering disclosed that the dark clothing was not obviously a uniform and that the lettering was photographed at an angle which adversely affected its legibility with the result that the lettering did "not appear as a flag to draw attention to that particular photograph." In making the presentation to the witnesses the FBI offered no comments which drew attention to any particular one picture, and there was positive evidence that no viewing witness made any statement indicating his feel-

ing that either of the photographs of the defendant was any different in appearance of clothing from the photographs of the other persons shown. Four of the witnesses identified Butler at the trial. One of these eyewitnesses, however, said he could not be positive. In rejecting the claim of error the Court of Appeals said the witness' uncertainty confirmed its reaction from examination of them that neither the number of the photographs nor their nature was so suggestive as to create a substantial likelihood of misidentification. Moreover, it pointed out that all the witnesses who identified defendant from the photographs, identified him independently of them at the trial, were cross-examined searchingly, and their credibility fully and fairly submitted to the jury. 405 *F.* 2d at 396–397.

*Joyner v. State, supra,* was a rape case in which defendant sought to exclude an in-court identification by the victim on the ground that an extrajudicial photographic procedure in which she identified defendant was impermissibly suggestive, and consequently tainted the in-court identification. At the trial the State did not rely upon any photographic identification, but during the prosecutor's direct examination the victim made a positive identification of defendant as the person who attacked her. Both courts, trial and appellate, found that the evidence clearly and convincingly justified the conclusion that it was based upon her observations of the defendant other than the photographic identification, and that this independent source made her testimony admissible. 257 *A.* 2d at 452–454.

On cross-examination the defendant had introduced the subject of an out-of-court identification by the victim about two months after the crime upon examination of a number of photographs exhibited to her by the police. They were shown to her without comment or suggestion that the offender was among them. She selected a picture of the defendant as her attacker, pointing out as she did, that in the photograph he had a beard but that he had no beard

at the time of the rape. After she made the identification, one of the officers told her the defendant's name and that he had committed a number of rapes. The officer testified that on handing her "fifteen-eighteen" photographs he said they had a suspect whose picture was in the group, *i. e.,* "a person arrested for similar offenses * * * [who] may be responsible for yours [so] please look through the group of photographs and see if you can identify him." She did so and picked out the defendant.

The court said that the photographic identification evidence not having been brought out by the State but by the defendant on cross-examination would go only to the admissibility of the victim's challenged in-court identification, and could not be considered by the trier of the fact as substantive independent evidence of identity or corroborative of her in-court identification. The trial court found on all the evidence before it that the photographic identification procedure was not impermissibly suggestive and so denied defendant's motion to exclude the in-court identification. The appellate court agreed and said also that in any event the evidence of the in-court identification clearly and convincingly showed that its source was independent of the photographs. Consequently the conviction was affirmed.

■ The Court of Appeals for the Fourth Circuit in *Cunningham, supra,* felt that the test prescribed in *Simmons,* is difficult to apply because the articulation of it describes a result but not how the result is to be reached. *United States v. Cunningham, supra,* 423 *F.* 2d at 1272. But it seems plain to us that the Supreme Court intended to make admissibility of an in-court identification depend upon the conclusion to be drawn from the totality of the circumstances in the case. If on such evaluation the out-of-court procedures were so impermissibly suggestive as to fix in the victim's mind an identity probably based upon photographs rather than upon an independent mental picture of the person gained from observations of him at the

time of commission of the crime, the in-court identification should be excluded.

Applying the *Simmons* test to the appeal now before us we are satisfied that Mrs. Venneri's in-court identification of defendant Thompson was the product of her clear and independent image of him as it was projected to her at the scene of the crime.

## IV

Defendant contends that it was improper and prejudicial to allow the State to introduce in evidence a photograph of a footprint on the rug of the bathroom floor between the bedrooms of Mr. and Mrs. Palmer; and also an allegedly posed photograph of the body on the floor of the foyer.

The State put in evidence several photographs which revealed in sequence the total scene of the criminal event: the front of the Palmer house, a close-up of the point of the murderer's entry, *i. e.,* the slashed screen and broken window, then the interior scene of the broken window in Mr. Palmer's bedroom, followed by the objected-to picture of a muddy footmark in the bathroom connecting the two bedrooms. Next there was a general view of Mrs. Palmer's bedroom, and another view thereof revealing the alcove where the fatal struggle probably began and where bloodstained molding and the part of the broken string of pearls were found. Even though the muddy footmark was not shown to have been made by defendant, the picture of it was simply a link in the graphic presentation of the probable course pursued by the intruder during his criminal mission. We fail to see how the picture of itself or in combination with the others described could possibly be classed as irrelevant or as prejudicial error.

Defendant complains also of the admission in evidence of a photograph of Mrs. Palmer's body lying on the floor in the foyer where it was found. The victim is pictured lying on her back with sizeable bloodstains close by. In addition

the can of Rebuff, which was referred to many times in the evidence, is shown a few inches from the deceased's right hand. Defendant charges that the photograph is "posed," gruesome, unnecessary to the proof of the crime and so inflammatory as to interfere with a dispassionate consideration of defendant's guilt or innocence.

As noted above, when the police arrived on the scene Mrs. Palmer's body was discovered face down at the place shown by the challenged photograph. No signs of pulse or breathing were detected, but a police sergeant called a doctor and an ambulance immediately, following which he obtained a resuscitator from his car, turned the body over and applied the resuscitator for about 20 minutes. The police photographer took a picture during the course of this effort at revival. Among other things it shows the can of Rebuff clutched in the victim's right hand. Defendant does not contend on this appeal that admission of that picture constituted error. The criticized photograph is different only in that it shows the bloodstained carpeting and the can of Rebuff (which, as had been explained, had been removed from Mrs. Palmer's hand) in the position described above.

It has long been the rule in this State that admissibility of photographs of the victim of a crime rests in the discretion of the trial court, and the exercise of its discretion will not be reversed in the absence of a palpable abuse thereof. *State v. Conklin,* 54 *N. J.* 540, 545 (1969); *State v. Gosser,* 50 *N. J.* 438, 448 (1967), *cert. den.* 390 *U. S.* 1035, 88 S. Ct. 1434, 20 *L. Ed.* 2d 295 (1968); *State v. Coleman,* 46 *N. J.* 16, 26–27 (1965), *cert. den.* 383 *U. S.* 950, 86 S. Ct. 1210, 16 *L. Ed.* 2d 212 (1966); *State v. Smith,* 32 *N. J.* 501, 525 (1960), *cert. den.* 364 *U. S.* 936, 81 S. Ct. 383, 5 *L. Ed.* 2d 367 (1961); Annotation, "Evidence — Photograph of Corpse," 73 *A. L. R.* 2d 769 (1960). Such abuse exists only where the "logical relevance will un-

questionably be overwhelmed by the inherently prejudicial nature of the particular picture." *State v. Smith, supra,* 32 *N. J.* at 525, 161 A. 2d at 532.

The questioned photograph was one of the series depicting the path followed by the killer from the place of entry into the house, into the bedroom where Mrs. Palmer's struggle for her life began, and then into the foyer where the tragedy was completed. Pictures of a murdered body are likely to cause some emotional stirring in any case, but that of itself does not render them incompetent. They become inadmissible only when their probative value is so significantly outweighed by their inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence. We find no such likelihood in this case, nor any substance to the argument that the so-called "posing" of the body calls for a different conclusion. *State v. Ebelsheiser,* 242 *Iowa* 49, 43 *N. W.* 2d 706 (1950); Annotation, "Evidence — Posed Photograph," 19 *A. L. R.* 2d 877 (1951). Defendant does not suggest, nor was there any basis for suggesting that, as in *State v. Ray,* 43 *N. J.* 19, 32–33 (1964), the "posing" was engaged in by the police to support some significant testimonial contention advanced by the State at trial.

## V

### (A)

Defendant urges that the trial court committed prejudicial error in allowing a police officer to read his investigation notes into evidence.

The defense called Lieutenant Norton Euart of the State Police as its witness. At the outset of his examination defendant's attorney established that Euart had participated in the investigation of the murder and had made written reports thereon to his superiors. Then at counsel's request the reports were marked for identification. It appeared par-

ticularly that Euart had interviewed defendant's sister-in-law Mrs. Ferrell and made notes of the interview. These notes were also marked for identification. The defense then inquired at considerable length into his conversations with Mrs. Ferrell, during the course of which he was asked to review his notes to refresh his recollection. And although he indicated he did not think the notes were needed to refresh his recollection, it is obvious from the record he did look at them while testifying.

On cross-examination the prosecutor inquired as to whether he had omitted anything from his statements concerning the talk with Mrs. Ferrell. And the prosecutor said, "So if you need those notes to refresh your recollection on a little or a lot of detail, would you please do so. If you feel that your memory is good enough to give almost everything you noted, why, you don't have to refer to them." Lieutenant Euart then added a few more specifics about the telephone conversations that Mrs. Ferrell told him she had had with Thompson, most of which had already come into the record when Mrs. Ferrell was on the witness stand.

Euart was not asked to read his notes, nor does it appear that he did read verbatim from them in connection with the few additional factual statements he made at this point in his testimony. Defendant moved for a mistrial alleging that the witness "read his entire statement into evidence." The motion was denied and we see no abuse of discretion in the ruling. Factually the motion was unwarranted because obviously the entire notes were not read, and Euart testified that his remarks were the "substance" of his notes. Beyond this, the notes exceeded three pages in length and obviously contained more information than he related in the 24 lines of testimony which followed the prosecutor's cross-examination request to refresh his recollection, if necessary, from his notes and to give any omitted details of his conversation with Mrs. Ferrell.

Defense relies upon *State v. Cooper,* 10 *N. J.* 532, 554–555 (1952) to support its claim of error. The situations are not at all similar. In *Cooper* one of the defendants had been interrogated by a police officer who took notes of the conversations. Over defense objection the notes were admitted in evidence as a memorandum of defendant's statements and they were taken into the jury room at the end of the case. In reversing the conviction this Court pointed out that the so-called statement had not been read to or by defendant, nor had he signed it or otherwise acknowledged its correctness. Under the circumstances the Court said the oral testimony of the officer was the only proper basis for admission of the conversation and it was prejudicial to allow the officer's memorandum to accompany the jury into the jury room. In the present case the notes were not admitted in evidence, nor is it clear that the portion complained of was actually read therefrom. It is plain beyond question that Lieutenant Euart was called as a defense witness, that defendant's attorney had the notes marked for identification and used them and had the witness use them to facilitate his testimony. Moreover, the notes were those of the witness and related to the statements and testimony of another witness whose credibility had been sharply attacked by the defense. Under all the circumstances we see no merit in defendant's contention under this point.

## (B)

It is alleged that the trial court erred in allowing a certain speculative conclusion of the State's expert chemist to stand.

The witness testified that he found Rebuff spray stains on one side of the inside of Mrs. Palmer's pocketbook and no such stain on the inside bottom. Absence of stains on the bottom indicated to him that the can had not leaked. He said further that the stain on the inside of the pocketbook was a confined spray. It was fairly inferable from his

statements that the spray had been activated by pressure on the release button on the can and that the pressure had been exerted within the pocketbook. In the course of a long answer describing the condition of the pocketbook and how the Rebuff can operated he said:

> It's a pretty well protected head; its like a camel—double camel's hump and in between sits the little button that you deflect to cause the vapor to come out of the can and when somebody would tend to take that out of the pocketbook and grab it and in their haste * * *.

At this point defense counsel interrupted to object to the witness stating such a conclusion to the jury. The court then instructed the prosecutor to have the witness testify first as to what he found. This was done at some length on the continued direct examination. In sum the witness' testimony suggested the likelihood that the Rebuff spray had been ejected by pressure applied to the discharge button within the pocketbook.

On cross-examination defense counsel developed that the Rebuff can had "a plunger on the top of it," and that it had to be pressed to energize it. These questions and answers followed:

> "Q. You drew a conclusion, did you not, that the only way or the way in which this spray was released was by someone taking it out of the pocketbook. Isn't that right?
> A. That's right; that's right.
> Q. And someone who put a finger on that spray and released it at that time?
> A. That's right.
> Q. And you say that that is the way it happened?
> A. Yes * * *."

 It was a fair conclusion for the jury to draw from all the facts relating to the can of Rebuff and the various locations of the spray therefrom inside the pocketbook, on Mrs. Palmer's hand and clothes and on the wall of the foyer, that she was trying to use the chemical to repel the killer's attack. The trial court exercising a discre-

tionary control over the State's direct examination of the expert witness endeavored to avoid admission of conclusory statements in connection therewith, which normally should be the jury's function. On the first occasion when the witness started to indicate that "the Rebuff was probably in the pocketbook and in trying to reach it, or * * *," the answer was cut off by an objection, and later the incomplete answer was stricken as a conclusion. Much later in the examination the somewhat similar answer, which forms the basis of this ground of appeal, was cut off again by defense objection, without a motion to strike the answer then or later. There was no express repetition thereafter at the instance of the prosecutor of the conclusion which obviously the witness had drawn from the facts, and which the jury could reasonably draw, *i. e.* that in Mrs. Palmer's desperate effort to get the Rebuff can out of her pocketbook she released some of the spray within the bag. However, the first clear and express articulation of the witness' conclusion in that regard was introduced by defense counsel's leading questions on cross-examination.

On the whole record, we hold the view that the matter was handled in a manner that was within the reasonable discretion of the court, and that defendant did not suffer any error as a result which would justify reversal of his conviction. *State v. Mayberry,* 52 *N. J.* 413, 433–434 (1968), *cert. den.* 393 *U. S.* 1043, 89 *S. Ct.* 673, 21 *L. Ed.* 2d 593 (1969) ; *State v. Pickles,* 46 *N. J.* 542, 578 (1966).

## VI

Defendant contends that the unitary trial procedure followed in New Jersey in murder cases, under which the jury determines guilt and penalty in one proceeding, is a denial of due process and consequently violative of the Fifth and Fourteenth Amendments of the Federal Constitution. Both the United States Supreme Court and this Court have specifically ruled otherwise. *McGautha v. California,* 402

*U. S.* 183, 91 *S. Ct.* 1454, 28 *L. Ed.* 2d 711 (1971); *State v. Forcella,* 52 *N. J.* 263, 287–290 (1968), *cert. dismissed* 397 *U. S.* 959, 90 S. Ct. 999, 25 *L. Ed.* 2d 252 (1970); *State v. Artis,* 57 *N. J.* 24, 36–37 (1970).

 The further claim is made that the New Jersey murder statute, *N. J. S. A.* 2A:113–4, violates due process because it contains no standards to guide the jury's discretion in deciding whether to impose the death penalty or to recommend life imprisonment. The cases at the federal and state level referred to above found no such constitutional infirmity, and those decisions have settled the matter.

## VII

It is urged that *N. J. S. A.* 2A:113–4 offends the Eighth Amendment because the death penalty constitutes cruel and unusual punishment.

The death penalty has long been considered a matter of legislative policy.[1] No state or federal court decision has been cited in which it was declared violative of the Eighth Amendment. In fact, in recent years numerous state courts including this Court (*State v. Forcella, supra,* 52 *N. J.* 263), and many lower federal courts sustained its validity. Goldberg and Dershowitz, "Declaring the Death Penalty Unconstitutional," 83 *Harv. L. Rev.* 1773, 1774–75 (1970). In those instances in the past when the United States Supreme Court spoke on the subject, it has indicated that the death penalty for murder is not within the condemnation of the Eighth Amendment. *McGautha v. California, supra,* 402 *U. S.* at 225–226, 91 *S. Ct.* at 1476, 28 *L. Ed.* 2d at 737 (Black, J., concurr.); *Trop v. Dulles,* 356 *U. S.* 86,

---

[1] In 1964 the Legislature by joint resolution created a commission to study the death penalty. The commission's report recommended that the penalty be retained. Between 1956 and 1968, 25 bills were introduced in the Assembly and the Senate to abolish capital punishment. None was adopted. See *State v. Forcella, supra,* 52 *N. J.* at 283.

99, 78 S. Ct. 590, 2 *L. Ed.* 2d 630, 641 (1958); *Louisiana ex rel. Francis v. Resweber,* 329 *U. S.* 459, 463–464, 67 S. Ct. 374, 91 *L. Ed.* 422, 426, *reh. den.* 330 *U. S.* 853, 67 S. Ct. 673, 91 *L. Ed.* 1295 (1947); *In re Kemmler,* 136 *U. S.* 436, 447, 10 S. Ct. 930, 34 *L. Ed.* 519, 524 (1890); *Wilkerson v. Utah,* 99 *U. S.* 130, 134–135, 25 *L. Ed.* 345 (1879); and see Packer, "Making the Punishment Fit the Crime," 77 *Harv. L. Rev.* 1071, 1081 (1964); Note, "The Cruel and Unusual Punishment Clause and the Substantive Criminal Law," 79 *Harv. L. Rev.* 635, 638–39 (1966). However, we have been advised that the Court has accepted the problem for determination, and presumably will decide it during the present term upon achievement of the full complement of Justices. *Nedrud, Criminal Law* 1971, Comments p. 17 G § 2.6, 40 *U. S. L. W.* 1046 (10/5/71). Under the circumstances we will withhold decision thereon in this case pending decision by the Federal tribunal.

## VIII

Defendant argues that the death penalty provision of the murder statute, *N. J. S. A.* 2A:113–4, is unconstitutional by reason of the decision of the United States Supreme Court in *United States v. Jackson,* 390 *U. S.* 570, 88 S. Ct. 1209, 20 *L. Ed.* 2d 138 (1968). In that case the Supreme Court declared invalid a federal kidnapping statute which subjected a defendant to the peril of a death sentence if he elected to be tried by a jury, but to no more than life imprisonment if tried by a judge. The majority of our Court in a comprehensive opinion by the Chief Justice in *State v. Forcella, supra,* 52 *N. J.* 263,[2] distinguished the New Jer-

---

[2]The opinion disposed of four separate cases involving the *Jackson* issue, which were consolidated for argument. *State v. Forcella,* 35 *N. J.* 168 (1961), *cert. den.* 369 U. S. 866, 82 S. Ct. 1035, 8 *L. Ed.* 2d 86 (1962); *State v. Funicello,* 49 *N. J.* 553 (1967), *cert. den.* 390 *U. S.* 911, 88 S. Ct. 837, 19 *L. Ed.* 2d 882 (1968), and *State v. Ornes, State v. Perez,* involving interlocutory motions before trial to eliminate the death penalty.

sey statute from that involved in *Jackson* and sustained its validity. Further, it was held that if *Jackson* were applied to our statute the consequence would be to excise the portion of *N. J. S. A.* 2A:113-3 which authorizes the trial court to accept a *non vult* plea to a murder indictment and which provides that upon acceptance of such a plea the punishment shall be limited to life imprisonment or to that imposed upon a conviction of murder in the second degree. In that event, as *Forcella* noted, the remainder of the statute would survive with the unhappy result that upon striking the provision for allowance of a *non vult* plea, designed as it was by the Legislature to benefit a defendant, all defendants under indictment for murder then being unable to plead guilty or *non vult,* would have to go to trial and thus risk the death penalty. 52 *N. J.* at 280-285. The various reasons for the inapplicability of *United States v. Jackson* in our State were outlined in detail in *Forcella* and need not be repeated here.

Funicello and Forcella[3] then petitioned for *certiorari* in the United States Supreme Court. Three years after our opinion was filed the Supreme Court granted *certiorari* and without further argument or briefs thereon summarily reversed with this terse statement:

Judgment, insofar as it imposes the death sentence, reversed and case remanded to the Supreme Court of New Jersey for further proceedings. Witherspoon v. Illinois, 391 U. S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968) ; Boulden v. Holman, 394 U. S. 478, 89 S. Ct. 1138, 22 L. Ed. 2d 433 (1969) ; Maxwell v. Bishop, 398 U. S. 262, 90 S. Ct. 1578, 26 L. Ed. 2d 221 (1970) ; and United States v. Jackson, 390 U. S. 570, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968). Mr. Justice Black dissents. *Funicello v. New Jersey,* 403 *U. S.* 948, 91 S. Ct. 2278, 29 *L. Ed.* 2d 859 (June 28, 1971).

The State filed a petition for rehearing seeking clarification of the ruling. It pointed out that no *Witherspoon*

---

[3]Forcella died thereafter and before the petition was acted upon. The petition was then withdrawn. See 397 *U. S.* 959, 90 S. Ct. 999, 25 *L. Ed.* 2d 252 (1970).

issue was involved in *Funicello*. Such issue had not been raised below and the *voir dire* testimony had not even been transcribed nor included anywhere in the record nor considered by our Court. *State v. Forcella, supra,* 52 *N. J.* at 292. Moreover, in referring to *Jackson* in its cryptic summary reversal, the Federal Supreme Court completely ignored this Court's thorough explanation of the reasons why *Jackson* did not apply to the New Jersey Statute generally, and particularly in Funicello's case, where a plea of guilty or *non vult* was neither offered by defendant nor, because of the defendant's obvious guilt of a brutal murder, acceptable to the State, if it had been offered. Consequently, there was no basis in fact for a claim, nor was any such claim made, that the form of the murder statute imposed an unconstitutional coercion upon the defendant to plead *non vult* and to waive his right to trial by jury.

Subsequent to *Jackson*, the United States Supreme Court decided *North Carolina v. Alford,* 400 *U. S.* 25, 91 S. Ct. 160, 27 *L. Ed.* 2d 162 (1970) wherein Alford who was charged with first degree murder, had been permitted to plead to second degree murder. The pertinent North Carolina statute[4] fixed the penalty for first degree murder at death unless upon trial the jury recommended life imprisonment. It was provided also that a guilty plea of a first degree murder indictment might be accepted by a trial court, in which event the penalty would be life imprisonment instead of death. After Alford pleaded and was sentenced *Jackson* was decided whereupon Alford sought post conviction relief alleging that his plea was entered through fear and coercion in order to avoid risk of the death penalty if

---

[4]After *Jackson* the North Carolina Legislature amended its statute by eliminating the provision permitting guilty pleas in capital cases. In *Forcella* this Court indicated that if *Jackson* applied to the *non vult* provision of the New Jersey statute, the effect would be to render inoperable the authorization for the plea. *State v. Forcella, supra.* 52 *N. J.* at 281–284.

he went to trial. On appeal, the Fourth Circuit Court of Appeals vacated the plea, without an evidentiary hearing, since it read *Jackson* to require invalidation of the North Carolina statutory framework for the imposition of the death penalty because the statute encouraged defendants to waive constitutional rights by the promise of no more than life imprisonment if a guilty plea was offered and accepted. 405 *F*. 2d 340 (4 Cir. 1968).

The Supreme Court reversed saying *Jackson* had not changed the standard for determining the validity of a guilty plea. "The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." 400 *U. S.* at 31, 91 *S. Ct.* at 164, 27 *L. Ed.* 2d at 168. Therefore, it said the court below should not have ruled that *Jackson,* of itself, required invalidation of the guilty plea. Instead, the issue of voluntariness should have been decided on all of the facts surrounding the offer of the plea to the trial court. In expressing the view of six members of the Court, Mr. Justice White said:

"Relying on United States v. Jackson, supra, Alford now argues in effect that the State should not have allowed him this choice [of offering a plea] but should have insisted on proving him guilty of murder in the first degree. The States in their wisdom may take this course by statute or otherwise and may prohibit the practice of accepting pleas to lesser included offenses under any circumstances." 400 *U. S.* at 38–39, 91 S. Ct. at 168, 27 *L. Ed.* 2d at 172. (Insertion ours.)

Compare, *Parker v. North Carolina,* 397 *U. S.* 790, 90 S. Ct. 1458, 25 *L. Ed.* 2d 785 (1970)[5]; *Brady v. United*

---

[5]In *Parker* as in *Alford* the Court pointed out that the portion of the North Carolina statute permitting a guilty plea was repealed. Referring to the change, the majority said: "As a result of the repeal, a person who is charged with a capital offense and who is not allowed to plead to a lesser charge must apparently face a jury trial and a death penalty upon a verdict of guilty unless the jury recommends life imprisonment." 397 *U. S.* at 795, n. 6, 90 S. Ct. at 1461, 25 *L. Ed.* 2d at 791, n. 6.

*States,* 397 *U. S.* 742, 90 S. Ct. 1463, 25 L. *Ed.* 2d 747 (1970).

Returning to the State's petition for rehearing in *Forcella,* reference was made therein to the *Alford* and *Brady* cases, which are difficult to reconcile with *Jackson.* Additionally, the petition raised the question whether *Jackson* was intended to be applied retroactively to pleas to first degree murder or to trials where no plea had been offered by the defendant, or where, if offered would not have been acceptable to the prosecution or to the trial court. And attention was called to the conflict of authority on that subject in the lower federal courts. Cases cited supporting denial of retroactivity were: *Lone v. United States,* 299 *F. Supp.* 855 (N. D. Cal. 1969), *aff'd per curiam* 432 *F.* 2d 1233 (9 Cir. 1970); *Pindell v. United States,* 296 *F. Supp.* 751 (D. Conn. 1969); *United States ex rel. Buttcher v. Yeager,* 288 *F. Supp.* 906 (D. N. J. 1968); and cases *contra, Natale v. United States,* 424 *F.* 2d 725 (9 Cir. 1970); *Shaw v. United States,* 299 *F. Supp.* 824 (S. D. Ga. 1969). On October 12, 1971 without comment the United States Supreme Court denied the State's request for a rehearing in *Funicello.* (404 *U. S.* ——, 92 *S. Ct.* 31, 30 *L. Ed.* 2d 125).

Under the circumstances the issue of constitutionality of the death penalty provision of *N. J. S. A.* 2A:113–4, as well as the effect of such a decision upon the future application of the statute, will be set down for reargument before this Court upon a date to be fixed in the near future.

IX

As a final constitutional issue defendant contends that his Fourteenth Amendment rights were violated by the jury selection procedure which the trial court followed. Reference is made to nine prospective jurors who were excused for cause on account of their attitude toward capital punishment. The claim is that the action of the court in excus-

ing them violated the rule of *Witherspoon v. Illinois, supra,* 391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed.* 2d 776 which was stated by the United States Supreme Court in the following terms:

> Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. [391 *U. S.* at 521–522, 88 S. Ct. at 1776–1777, 20 *L. Ed.* 2d at 784–785]

> \* \* \* \* \* \* \* \*

> And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the voir dire testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion. 391 *U. S.* at 522, n. 21, 88 S. Ct. at 1777, 20 *L. Ed.* 2d at 785, n. 21.

This Court interpreted *Witherspoon in State v. Mathis,* 52 *N. J.* 238 (1968) to signify that the State is entitled to jurors who are impartial as to punishment, and that a juror qualifies as impartial even though he has a bias against the death penalty, provided his bias is not so strong as to preclude him from considering death as punishment for the murder. 52 *N. J.* at 244. Applying the described test to the challenged instances of veniremen who were excluded for cause, we found no *Witherspoon* error.

Mathis filed a petition for *certiorari* in the United States Supreme Court and on June 28, 1971, the same day as *Funicello* was decided, that Court granted *certiorari,* and without further briefs or argument reversed the death sentence saying:

Judgment, insofar as it imposes the death sentence, reversed and case remanded to the Supreme Court of New Jersey for further proceedings. Witherspoon v. Illinois, 391 U. S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968) ; Boulden v. Holman, 394 U. S. 478, 89 S. Ct. 1138, 22 L. Ed. 2d 433 (1969) ; and Maxwell v. Bishop, 398 U. S. 262, 90 S. Ct. 1578, 26 L. Ed. 2d 221 (1970). Mr. Justice Black dissents. *Mathis v. New Jersey*, 403 *U. S.* 946, 91 *S. Ct.* 2277, 29 *L. Ed.* 2d 855 (June 28, 1971) ; application for rehearing and clarification denied without comment. (404 U .S. ——, 92 S. Ct. 31, 30 L. Ed. 2d 125 (October 12, 1971)).

Uncertainty now exists as to whether the summary reversal means that the Supreme Court disapproved of our interpretation of *Witherspoon,* or that accepting our interpretation the test was erroneously applied to the facts disclosed on the *voir dire* examination of the excused jurors, and on a proper application of the test laid down in *Witherspoon* the jurors in question were erroneously excused for cause. That uncertainty affects the resolution in the present case of defendant Thompson's charge that the trial court erred in excusing the nine jurors for cause during their *voir dire* examination on account of their view on capital punishment. Accordingly, in the reargument mentioned above, the parties will be directed to deal with the *Witherspoon* issue in light of the Federal Supreme Court's memorandum in *State v. Mathis, supra.*

## X

For the reasons stated we find no error in the finding of defendant's guilt of murder in the first degree. However, final judgment will be withheld pending the reargument called for above.

*For affirmance but judgment withheld*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.