**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3029-15T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ORLANDO TRINIDAD,

    Defendant-Appellant.

_____

Submitted January 18, 2018 – Decided  September 17, 2018

Before Judges Simonelli, Rothstadt and Gooden Brown.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Indictment No. 14-01-0314.

Joseph E. Krakora, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).

Robert D. Laurino, Acting Essex County Prosecutor, attorney for respondent (Kayla E. Rowe, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant Orlando Trinidad, a former police officer, was convicted of second-degree conspiracy to commit official misconduct, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:30-2 (count one); second-degree official misconduct, N.J.S.A. 2C:30-2 (count two); third-degree tampering with public records, N.J.S.A. 2C:28-7(a)(2) (count three); fourth-degree falsifying or tampering with records, N.J.S.A. 2C:21-4(a) (count four); fourth-degree false swearing, N.J.S.A. 2C:28-2 (count five); and fourth-degree simple assault, N.J.S.A. 2C:12-1(a), amended from third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7) (count six). The charges stemmed from an incident on the Garden State Parkway on June 7, 2012.

Judge Michael L. Ravin merged count one with count two and sentenced Trinidad on count two to a five-year term of imprisonment with five years of parole ineligibility, concurrent to a three-year term on count three, nine-month terms on both counts four and five, and a six-month term on count six..

On appeal, Trinidad raises the following contentions:

> POINT I – DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO HIGHLY PREJUDICIAL COMMENTS MADE BY THE ALLEGED VICTIM THAT WERE SOLELY DESIGNED TO INFLAME THE PASSION OF THE JURY. (Not Raised Below).

2

POINT II – DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE [TO THE] ADMISSION OF INTERNAL AFFAIRS LIEUTENANT'S LAY OPINION ON THE DEFENDANT'S GUILT. (Not Raised Below).

POINT III – THE DEFENDANT'S SENTENCE WAS EXCESSIVE.

(A)   THE COURT ERRED IN FAILING TO SENTENCE THE DEFENDANT TO ONE-DEGREE LOWER.

(B)   IMPOSITION OF THE PAROLE INELIGIBILITY TERM WAS UNWARRANTED.

POINT IV – THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL N.O.V. BASED UPON INSUFFICIENCY OF THE EVIDENCE SHOULD HAVE BEEN GRANTED.

(A)   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE GUILTY VERDICT ON THE CHARGE OF CONSPIRACY.

(B)   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE GUILTY VERDICT ON THE CHARGE OF OFFICIAL MISCONDUCT.

(C)   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE GUILTY VERDICTS ON COUNTS THREE, FOUR OR FIVE.

We reject these contentions and affirm.

A-3029-15T3

<u>The Underlying Incident</u>

On June 7, 2012, Police Officers Sean Courter and Albert Sutterlin from the Township of Bloomfield Police Department (BPD) responded to a home on West Passaic Avenue on a report of a domestic violence incident between Marcus Jeter and his girlfriend, Ms. T. Killian. In his incident report, Courter gave the following version of what happened:

> Responded to . . . West Passaic Ave. on a report of a Domestic. Upon arrival Officer Sutterlin and I rang the doorbell to the residence. While ringing the doorbell a black male, later identified as Mr. Marcus Jeter, stuck his head out the second floor window and stated, "Come and get me". A female, later identified as Ms. [T.] Killian, then opened the front. While speaking with Ms. Killian, the girlfriend, she stated that her boyfriend, Mr. Jeter, just jumped out the back window. Officer Sutterlin and I heard an engine starting from the rear of the residence. A vehicle . . . came up the driveway at a high rate of speed. I stated to the driver, Mr. Jeter, to put the vehicle in park and give me his identification. Mr. Jeter ignored my order to put the vehicle in park and stated, "I did not do anything wrong". I spoke to Mr. Jeter through the front passenger side window, which was rolled down. As Mr. Jeter was speaking, I smelled a strong odor of an alcoholic beverage emanating from his breath and his eyes being bloodshot. In further observing the vehicle I observed the rear driver tire to be flat. I asked Mr. Jeter again to put the vehicle in park and give me his identification. Mr. Jeter refused and drove off at a high rate of speed, making a left onto West Passaic Ave. I ran to my vehicle and advised Central Communications and [Lieutenant Sean] Schwindt that I was pursuing this

4

vehicle. I activated my emergency lights and sirens and was able to view Mr. Jeter's vehicle make a right onto Broad St. from West Passaic Ave. Upon reaching Broad St., I observed Mr. Jeter's vehicle make a right onto Parkway South. I was able to catch up to Mr. Jeter's vehicle on the Parkway South. I pulled behind Mr. Jeter's vehicle, who continued to drive on the Parkway South. At this time, I observed the driver-side rear tire to be sparking, due to that Mr. Jeter was driving on the rim. After approximately 1,000 feet, Mr. Jeter's vehicle became disabled, due to that the driver-side rear rim was on its side. Mr. Jeter's vehicle came to rest at mile marker 154.1 on the Parkway South. I exited my vehicle with my handgun drawn on Mr. Jeter, who was still in the vehicle with the engine running. I gave Mr. Jeter multiple commands to shut off the vehicle and show me his hands. Mr. Jeter refused and stated "Fuck You, I did not do anything". Officer Sutterlin then arrived on scene. At this time I proceeded to the drivers side door and attempted to open it. The door was locked. I again gave Mr. Jeter verbal commands to open the door. Mr. Jeter refused and stated "Fuck You" and then rolled up his driver side window. I advised Central Communications that Mr. Jeter was refusing to exit the vehicle. Officer Trinidad arrived on scene and blocked Mr. Jeter's vehicle in from the front, due to that Mr. Jeter refused to turn off his vehicle. I again gave Mr. Jeter verbal commands to unlock the driver side door and exit the vehicle. Mr. Jeter refused. I then used my ASP, which is an expandable baton, to break Mr. Jeter's driver side window. When the window was broke, I gave Mr. Jeter verbal commands to open the door. Mr. Jeter refused. While Officer Sutterlin and Officer Trinidad stood by, I reached into the driver side window and opened the door. While reaching into the broken window, my left forearm was scraped by the broken glass. I was able to open the door. I advised Mr. Jeter to take off his seatbelt. Mr. Jeter refused. I

5

reached over Mr. Jeter and attempted to take off Mr. Jeter's seatbelt. <u>While attempting to take off Mr. Jeter's seatbelt, Mr. Jeter began grabbing onto my holster in an attempt to get my handgun. I advised Mr. Jeter multiple times to stop resisting. Officer Trinidad, Officer Sutterlin and I then attempted to take Mr. Jeter to the ground, at which time Mr. Jeter struck Officer Trinidad in the face with his fist</u>. We were then able to take Mr. Jeter to the ground. <u>While on the ground Mr. Jeter put his hands underneath his body in an attempt not to be handcuffed. I advised Mr. Jeter multiple times to stop resisting and give me his hands</u>. Officer Trinidad and I were able to handcuff Mr. Jeter. Mr. Jeter was then placed into patrol vehicle 4.

[(Emphasis added).]

Courter also filled out a "Bloomfield Police Department DVD Discovery Form," which indicated that both his and Trinidad's patrol vehicles were equipped with video cameras, the cameras were on during the incident, and the hard drives were removed from the patrol vehicles after the incident and placed into evidence.

In his incident report, Sutterlin gave the following version of the incident:

Responded to . . . West Passaic Avenue on a report of a [d]omestic. Upon arrival, Mr. Jeter opened an upstairs window and yelled: "Come and get me!" This officer then rang the doorbell until Ms. Killian responded. Ms. Killian stated that she just wanted Mr. Jeter to leave for the evening and that when she had gone to the door, Mr. Jeter jumped out the back window. Mr. Jeter was stopped at the end of the driveway as he was trying to leave. Officer Courter requested Mr. Jeter's license and

6

at this time, Mr. Jeter sped off, south on West Passaic Avenue. Mr. Jeter turned right onto Broad Street into the McDonald's [p]arking lot and then onto Garden State Parkway South. At mile marker 154.1, Mr. Jeter pulled over because his left rear tire had gone flat and the rim had broken. Mr. Jeter was ordered out of his vehicle and at this time, Mr. Jeter locked all the doors and rolled up all windows, refusing to come out. At this time, Lieutenant Schwindt acknowledged to use all necessary force to effect an arrest. At this time, the driver's window was broken. Mr. Jeter refused to take off his seat belt and <u>while Officer Courter was reaching over him, Mr. Jeter attempted to gain control of Officer Courter's firearm</u>. Mr. Jeter was then extricated from the vehicle and ordered to the ground. <u>At this time, Mr. Jeter refused to submit to arrest and necessary force was used to effect an arrest</u>.

[(Emphasis added).]

<u>Criminal Charges Filed Against Jeter</u>

On June 7, 2012, Courter signed complaint warrants against Jeter charging him with second-degree eluding, N.J.S.A. 2C:20-2B; third-degree resisting arrest, N.J.S.A. 2C:29-2(a)(3)(a); second-degree attempting to disarm a police officer, N.J.S.A. 2C:12-11(a); and obstructing administration of law or other governmental function, a disorderly persons offence, N.J.S.A. 2C:29-1(a).[1]

---

[1] Courter also issued motor vehicle summonses to Jeter for driving while license suspended, N.J.S.A. 39:3-40; reckless driving, N.J.S.A. 39:4-96; refusal to submit to an alcohol test, N.J.S.A. 39:4-50.2; driving while intoxicated, N.J.S.A. 39:4-50; failure to comply with directions of officers, N.J.S.A. 39:4-57; driving

On September 19, 2012, a grand jury indicted Jeter for second-degree eluding, N.J.S.A. 2C:29-2(b); second-degree attempting to disarm a police officer, N.J.S.A. 2C:12-11(a); third-degree aggravated assault on a law enforcement officer acting in the performance of his duties, N.J.S.A. 2C:12-1(b)(5)(a); and third-degree resisting arrest, N.J.S.A. 2C:29-2(a)(3)(a).

<u>The Internal Affairs Investigation</u>

Prior to his indictment, on June 12, 2012, Jeter filed a complaint against Trinidad and Courter with the Essex County Prosecutor's Office (ECPO), alleging they physically assaulted him. Jeter asserted that the officers turned on their police lights indicating for him to pull over, he pulled over, and "the cops approached [his] vehicle . . . beat him up and arrested him, never informing him why he was pulled over." He also alleged that a police vehicle crashed into the front of his vehicle. In response to Jeter's complaint, the ECPO contacted the BPD's Internal Affairs Division (IAD), which began an investigation.

In an interview with Lieutenant Michael J. Cofone of the IAD, Jeter said that he stopped his vehicle on the Garden State Parkway South after he saw the police lights and his tire started smoking. Once he stopped, he saw police

---

while intoxicated 1000 feet from a school, N.J.S.A. 39:4-50.6; and creating risk of an accident, N.J.S.A. 39:4-56.

officers on both sides of his vehicle pointing their guns at him saying "get the fuck out of the car." As soon as he saw their weapons, he put his hands up and complied with their instructions to turn off his vehicle. At that point, a police vehicle (driven by Trinidad) came from Garden State Parkway North and crashed into the front of his vehicle. After the officer on the left side of his vehicle broke his window, the officers "opened his door and punched him in the face, he was caught off guard, the [o]fficers . . . tried to take off his seatbelt and 'elbowed [him] in the face two times.'" After the officers removed his seatbelt, "they slammed [him] to the ground . . . handcuffed [him,] . . . patted [him] down and put [him] in the police car." During the encounter he asked to call his lawyer. As a result of the incident, he suffered a sprained wrist and cuts and bruises on his left arm, right arm, wrist, chest, and face.

Cofone obtained Courter's and Sutterlin's incident reports, the video recording from only Courter's patrol vehicle, and radio and telephone recordings. He consulted with Detective Andrew Zachares and was told the video recording from Trinidad's patrol vehicle was not available.

Cofone instructed Trinidad, Courter, and Sutterlin to submit administrative reports of the incident. In his administrative report, Trinidad stated:

9

On Thursday June 07, 2012[,] at approximately 00[:]14 hours[,] I was in marked unit #4 patrolling in my zone. Officer Sutterlin and Officer Courter received a call . . . that there was a domestic [violence incident] in progress at . . . West Passaic Avenue. I was originally dispatched by [C]ommunications[,] then I was told to disregard and resume patrol in my zone. Several minutes later Officer Courter relayed to Communications that [Jeter] . . . had fled the scene at a high rate of speed. . . . At this time I advised Central that I would be making my way to the scene. I activated my emergency over head lights and sirens and began making my way to the scene when I heard Officer Courter's next transmission that [Jeter] . . . had gotten onto Parkway South and [Courter] continued the pursuit until [Jeter] finally pulled over at mile marker 154.1. I asked Central for authorization to go onto Parkway North so that I could expedite my arrival to assist Officer[s] Courter and . . . Sutterlin. Lieutenant Schwindt gave the approval and I took Parkway North to the motor vehicle stop. When I reached their location[,] I carefully crossed the black top median yielding to traffic. When I saw that no traffic was coming[,] I drove across [with the] lights and sirens still activated and parked my vehicle . . . bumper to bumper with . . . [Jeter's] vehicle so that he would not attempt to flee or use his vehicle as [a] weapon . . . . When I exited my vehicle[,] I observed Officer[s] Courter and . . . Sutterlin giving multiple commands . . . to [Jeter] to "[e]xit the vehicle . . . ." I immediately began giving verbal commands to . . . [Jeter] to "[e]xit the vehicle . . . [as he was] under arrest[.]" [Jeter]. . . refused multiple verbal commands from Officer Courter and myself. At this time I verbally advised . . . [Jeter] that if he did not exit the vehicle we were going to breach the window to effect the arrest. [Jeter] . . . ignored my commands again stating[,] . . . "Fuck off![] I didn't do shit man[.]" Officer Courter then attempted to open the driver side

10

door but the door was locked. Officer Courter then used his asp (expandable baton) and successfully breached the window. Multiple verbal commands were given to . . . [Jeter] to unlock the door and exit his vehicle, [but] he refused. Officer Courter reached into the driver side window and opened the door. Officer Courter ordered . . . [Jeter] to take off his seat belt and exit the vehicle. [Jeter] . . . refused to comply. Officer Courter reached over . . . [Jeter] to take off his seat belt, at which time I observed      . . . [Jeter] grabbing Officer Courter[']s service weapon which he had holstered on his right hip. Officer Courter yelled[,] . . . "He's grabbing my gun . . . [.]" Officer Courter gave . . . [Jeter] multiple[] commands to let go of his gun and stop resisting. At that moment I was in fear for my partner[']s life and[] my own. Officer Sutterlin and I proceeded to grab . . . Jeter's hands off [of] Officer Courter's gun. Officer Courter was able to remove [Jeter's] seatbelt . . . . [When] attempting to extradite . . . [Jeter] from the vehicle, [Jeter] struck me in the face with a closed fist. After struggling with [Jeter,] we finally managed to take him to the ground. On the ground . . . [Jeter] continued flailing his arms and then plac[ed] his hands underneath his body. I ordered him to . . . [s]top resisting . . . [and g]ive me [his] hands[.]" And he refused. After struggling with . . . Jeter we finally were able to grab his hands and place him under arrest.

[(Emphasis added).]

Courter's administrative report mirrored his incident report, and he added:

I had to reach over Mr. Jeter[] to remove his seatbelt, but as I was reaching over Mr. Jeter began grabbing onto my holster attempting to remove my handgun. I was scared from my life. I stated he is going for my gun. Officer Trinidad and Officer Sutterlin

11

> immediately came to my aid and restrained Mr. Jeter's
> hands from removing my handgun.  Mr. Jeter continued
> to resist our efforts to arrest him.  We stated multiple
> times to stop resisting.  Mr. Jeter continued to flail his
> arms and body in an attempt not to be removed from the
> vehicle.

[(Emphasis added).]

Sutterlin provided more details of the incident in his administrative report, and added the following:

> At this time, Officer Courter stated that Mr. Jeter was
> attempting to take Officer Courter's weapon.  At this
> time, this officer and Officer Trinidad reached in to
> assist Officer Courter and extricate Mr. Jeter during
> which time Mr. Jeter struck Officer Trinidad in the face.
> Mr. Jeter was ordered several times to stop resisting,
> but Mr. Jeter continued to fight with the officers.  Mr.
> Jeter was brought to the ground and continued to resist
> by putting his hands underneath his body.

[(Emphasis added).]

Cofone found that Jeter's conduct and behavior precipitated the event, he lacked credibility, was uncooperative, actively resisted the officers' attempt to arrest him, attempted to grab Courter's weapon, and punched Trinidad in the face.  Cofone exonerated the officers, concluding the incident occurred, but the officers' actions were justified, legal, and proper.  On August 1, 2012, Cofone notified Jeter that the investigation indicate[d] that the officers followed the appropriate department policies and procedures.

On April 3, 2013, the case was reopened after Michael Morris of the ECPO notified Cofone of the existence of the video recording from Trinidad's patrol vehicle, which showed a very different account of the incident than what Trinidad, Courter and Sutterlin had reported.  In his investigation report, Cofone stated:

> Chief Goul, Sgt. Sierchio and I reviewed the recording; the recording provides an almost unobstructed view of the passenger compartment of Mr. Jeter's vehicle.  Trinidad responds from the GSP north bound side, crosses the grass median and the south bound lanes of traffic and strikes Mr. Jeter's vehicle at appx. 10-12 mph, Jeter immediately raises his hands; Trinidad exits his vehicle and runs around the passenger side of Jeter's vehicle.  P.O. Courter can be seen at the driver side of [Jeter's] vehicle striking his window with an object, the window appears to then explode, and Courter then clears the broken glass from the window area.  Courter then leans into the passenger compartment and opens the driver side door.   As this occurs Jeter's hands remain up, Courter then appears to grab Jeter's left hand/arm as Jeter's right arm is still raised and remains [raised].  Jeter then leans toward the passenger side and his left arm becomes free and he raises his left arm along with his right arm; both of his hands remain raised the entire time.  Courter is in the passenger compartment of [Jeter's] vehicle.  Even when Courter appears to grab Jeter in a bear hug both of [Jeter's] hands remain raised; at no time can Jeter be seen grabbing in any area of Courter[']s body as his hands remain raised at the vehicle[']s passenger compartment roof.  At no time does either P.O. Trinidad or P.O. Sutterlin enter the passenger compartment; additionally Trinidad does not appear on camera after

13

he runs from his vehicle to Jeter's [vehicle] subsequent to his arrival at the scene. While Courter was leaning in the passenger compartment Sutterlin appears at the passenger side window and appears to strike the passenger side window but it does not break, he then walks to the rear of Jeter's vehicle and is not seen again. At no time does Jeter appear to punch Trinidad in the face.

Chief Goul, Sgt. Sierchio and I viewed the recording several more times and did not view any attempt by Jeter to grab Courter in any way and at no time can Jeter be seen punching Trinidad. At no time do Sutterlin and Trinidad appear in the passenger compartment of Jeter's vehicle. There is no struggle by Trinidad or Sutterlin to remove Jeter's "hands" from Courter's weapon. At no time during the recorded events of this incident does a Supervisor respond to the scene of Jeter's arrest.

[(Emphasis added).]

Cofone concluded from his review of the video that Courter lied in his two reports by falsely reporting: Jeter grabbed his gun; Trinidad and Sutterlin came to his aid and restrained Jeter's hands from removing the gun; Jeter flailed his arms and body "when in reality Jeter ha[d] his hands up in a gesture of surrender the entire time[;]" and Jeter struck Trinidad in the face with a closed fist. Cofone noted the video showed that Jeter's hands remained up as Courter pulled him from his vehicle, and Courter pulled him from the vehicle and threw him to the ground in one motion.

14

Cofone concluded that Trinidad lied in his administrative report about Jeter's actions and that Jeter physically assaulted him. Cofone noted the video showed that after Jeter was handcuffed and secured, Trinidad picked him up and threw him onto the front passenger hood of Trinidad's patrol vehicle so hard that Jeter's feet came off the ground. The video also showed that Trinidad punched Jeter so hard in the head that his punch careened off Jeter and struck Courter in the face. Cofone also concluded that Sutterlin lied in his two reports that: Jeter tried to take Courter's gun; he and Trinidad assisted Courter; Jeter punched Trinidad in the face; and Jeter struggled.

Following an investigation by the ECPO, all charges against Jeter were dismissed. Specifically, the ECPO found from its review of the video recording from Trinidad's patrol vehicle "that [Jeter's] car was not in [the] sight line [of Courter's patrol vehicle] until shortly before [Jeter's] car was disabled and pulled to the shoulder of the [Garden State Parkway]. Therefore it would be impossible to impute to [Jeter] the knowledge that he was being pursued by police. For this reason the charge of [e]luding should be dismissed."

<u>The State's Evidence</u>

15

Trinidad, Courter and Sutterlin were criminally charged. Sutterlin pled guilty to fourth-degree falsifying or tampering with records and agreed to testify against Trinidad and Courter.

Sutterlin testified that Trinidad and Courter were waiting for him at police headquarters when he returned there one or two hours after the incident. He asked them what happened in order to provide a correct sequence of events, they told him what happened and what to write, and he wrote what they said in his report. Courter told Sutterlin that Jeter grabbed for his gun, but Sutterlin admitted he did not see this or see Jeter strike Trinidad. He admitted that he spoke to Trinidad and Courter several times about the incident before writing his administrative report to make sure he had the correct sequence of events. He also admitted his two reports were false, he knew they were false, he did not write them himself, and he was aided or helped by Trinidad and Courter.

Jeter testified that he did not elude the police, resist arrest, attempt to disarm Courter, or hit Trinidad. The video recording from Trinidad's patrol vehicle, which was played several times to the jury, corroborated Jeter's testimony and showed his hands were raised in a surrender gesture, and Trinidad assaulted him.

I.

At trial, Jeter referenced the high profile police brutality cases involving Amadou Diallo, Rodney King, and Sean Bell to explain why he did not exit his vehicle when commanded to exit and kept his hands raised. Trinidad's counsel requested, and Judge Ravin gave, a limiting instruction that the jury could only use this testimony if it found it was relevant to Jeter's state of mind in acting the way he acted. Courter's counsel cross-examined Jeter on this testimony.

Trinidad does not argue on appeal that the testimony was not relevant under N.J.R.E. 401. Rather, he argues for the first time in Point I that the testimony should have been barred under N.J.R.E. 403 because it was highly prejudicial and served no purpose other than to inflame the passions of the jury.

Because defendant did not raise this argument below, we review this issue for plain error. State v. Ross, 229 N.J. 389, 407 (2017) (citing R. 2:10-2). Under this standard, we will only reverse the error if "there is a real possibility that the error led to an unjust result, that is, 'one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Whitaker, 420 N.J. Super. 495, 512 (App. Div. 2008) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). We discern no error, let alone plain error, in the admission of this testimony.

"[T]he inquiry under . . . N.J.R.E. 403 is whether the probative value of the evidence 'is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the' issues." State v. Cole, 229 N.J. 430, 448 (2017) (alteration in original) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)). "It is not enough for the opposing party to show that the evidence could be prejudicial; '[d]amaging evidence usually is very prejudicial but the question here is whether the risk of undue prejudice was too high.'" Ibid. (alteration in original) (quoting State v. Morton, 155 N.J. 383, 453-54 (1998)). "To determine the admissibility of evidence under N.J.R.E. 401 and 403, the trial court conducts a fact-specific evaluation of the evidence in the setting of the individual case." Ibid. (citations omitted).

"In light of the broad discretion afforded to trial judges, an appellate court evaluates a trial court's evidentiary determinations with substantial deference." Id. at 449 (citing State v. Kuropchak, 221 N.J. 368, 385 (2015)). "On appellate review, '[c]onsiderable latitude is afforded' to the court's ruling, which is reversed 'only if it constitutes an abuse of discretion.'" Ibid. (alteration in original) (quoting Kuropchak, 221 N.J. at 385). "When a trial court weighs the probative value of evidence against its prejudicial effect pursuant to N.J.R.E.

403, its ruling should be overturned only if it constitutes 'a clear error of judgment.'"  Ibid.  (quoting State v. Koedatich, 112 N.J. 225, 313 (1988)).  "As [the] Court observed, applying the predecessor rule to N.J.R.E. 403, a trial court's weighing of probative value against prejudicial effect "must stand unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted.'"  Ibid. (quoting State v. Carter, 91 N.J. 86, 106 (1982)).

Judge Ravin did not abuse his discretion in permitting Jeter's testimony. The probative value of Jeter's testimony was not substantially outweighed by any undue prejudice, as it did not distract jurors from reasonably and fairly evaluating Trinidad's and Courter's version of events.  Rather, Jeter's testimony informed the jury's credibility assessment of the different versions of events advanced by Jeter and the officers.  The references to the other high profile cases were used only to explain Jeter's own actions at the time of the incident, not to analogize the present case to those prior cases.  Looking at his testimony on this issue as a whole, his references to other cases were not the focus, and were made only in relation to his own conduct and what motivated his behavior to help the jury determine which version of events was more likely.

19

Moreover, Judge Ravin mitigated any prejudicial effect by issuing limiting instructions. During Jeter's direct examination, Judge Ravin advised jurors that any references Jeter made to other cases should only be relied upon "insofar as . . . [they] find it is relevant to . . . [Jeter's] state of mind, why he did what it is that he said that he did or [did not] do." The judge again noted, prior to summations, that both parties have:

> agreed, based on . . . Jeter's testimony, that, if either side wants to talk about his testimony [during summations] concerning Rodney King, or Mr. Diallo, or any of those cases, that each side may comment on it only insofar as his testimony went to his state of mind at the time in question, should the jury find that that is material, and all parties find that his state of mind is material.

Jurors are presumed to have followed the court's instructions in the absence of evidence demonstrating otherwise. State v. Martini, 187 N.J. 469, 477 (2006). There is no such evidence here. Furthermore, defense counsel mitigated any prejudicial effect by cross-examining Jeter regarding the differences between those high profile cases and this case.

Thus, given the limited purpose for which it was introduced, the brief mention of those cases in relation to Jeter's entire testimony, Judge Ravin's two limiting instructions, and defense counsel's cross-examination of Jeter on these references, the probative value of Jeter's testimony was not substantially

outweighed by undue prejudice and, in turn, capable of resulting in a manifest denial of justice.

## II.

At trial, Cofone testified as a lay witness as follows:

> Q. And had you requested, from Detective Zachares, the second video; in other words, the video recording from [Trinidad's patrol vehicle].
>
> A. When I first conducted my investigation, I requested from him all available evidence. That would have encompassed anything there may have been. Some things, he was aware of, as the evidence video tech.
>
> Q. After the investigation, did you change your findings or have any other findings as to the conduct of these officers at the time?
>
> A. Not immediately. I did a review of that second piece of evidence[, the dash cam video from Trinidad's patrol car] with the assistance of Sergeant Sierchio and Chief Gould.
>
> Q. Did you then make any findings?
>
> A. Yes, ma'am.
>
> Q. What were those?
>
> A. I changed the disposition from exonerated to sustained.
>
> . . . .

Q    Sir, after watching this second video, the video from car number 4, did you -- did you conduct any further investigation?

A    Yes, ma'am.

Q    What did you do?

A    Uh, well, I informed the chief -- we saw the video -- that it appeared that, based on the new evidence, the actions of the officers, umm, appeared to have been criminal, and we forwarded the case to the Essex County Prosecutor's Office for a criminal review.

In Point II, Trinidad argues for the first time on appeal that this testimony was inadmissible lay opinion on his guilt under N.J.R.E. 701. We disagree.

"Lay witnesses may present relevant opinion testimony in accordance with [N.J.R.E.] 701, which permits 'testimony in the form of opinions or inferences . . . if it . . . is rationally based' on the witness' 'perception' and 'will assist in understanding the witness' testimony or in determining a fact in issue.'" State v. Lazo, 209 N.J. 9, 22 (2012) (alterations in original) (quoting N.J.R.E. 701). In State v. McLean, 205 N.J. 438 (2011), the Court described the boundary line that separates factual testimony by police officers from permissible expert opinion testimony as follows:

> On one side of that line is fact testimony, through which an officer is permitted to set forth what he or she perceived through one or more of the senses. Fact testimony has always consisted of a description of what

22

the officer did and saw, including, for example, that defendant stood on a corner, engaged in a brief conversation, looked around, reached into a bag, handed another person an item, accepted paper currency in exchange, threw the bag aside as the officer approached, and that the officer found drugs in the bag. Testimony of that type includes no opinion, lay or expert, and does not convey information about what the officer "believed," "thought" or "suspected," but instead is an ordinary fact-based recitation by a witness with first-hand knowledge.

[Id. at 460 (citations omitted).]

The Court explicitly rejected the argument "that there is a category of testimony that lies between [expert and lay opinions] . . . that authorizes a police officer, after giving a factual recitation, to testify about a belief that the transaction he or she saw was a narcotics sale." Id. at 461. The Court reasoned that such an approach would "transform[] testimony about an individual's observations of a series of events . . . into an opportunity for police officers to offer opinions on defendants' guilt." Ibid.

The Court's explanation of why the testimony in McLean was impermissible has no resonance here. Cofone's testimony was not dispositive of whether Trinidad was guilty of the charges, and he did not testify as to the ultimate issue of whether Trinidad committed the offenses. Unlike the police officer in McLean, Cofone was not asked for his conclusion or observation about

23

the nature of Trinidad's conduct, and he did not express a belief regarding his guilt. Rather, his testimony only discussed whether Jeter's claim that the officers assaulted him was "sustained," not whether the officers committed the offenses. More importantly, Cofone's testimony did not lead the jury to reach a result it would not have otherwise reached when considering the overwhelming proofs that Trinidad assaulted Jeter.

Cofone's testimony relating what he told the Chief of Police regarding his review of the video and its depiction of Trinidad's and Courter's behavior did not exceed the bounds of permissible lay opinions. The testimony was rationally based on Cofone's perception and served to inform the jury how IAD conducted its internal investigation. The testimony consisted of what he saw on the video and what he did during a further investigation into the officers' behavior. Moreover, the testimony was the "product of reasoning processes" familiar to the jury, as they were later able to view the video several times, which highlighted the discrepancies between Trinidad's and Courter's behavior and what they said in their police reports. United States v. Garcia, 413 F.3d 210, 215 (2d Cir. 2005). While Cofone testified that based on the video, Trinidad's and Courter's conduct appeared criminal, his testimony was not offered to provide an opinion on their guilt, but to explain the steps he took when

conducting the investigation.

Nonetheless, even if Cofone's testimony constituted inadmissible lay opinion, its admission was not capable of causing an unjust result. The jury was able to see and evaluate the video numerous times during the trial. Moreover, the prosecutor did not only rely upon Cofone's lay testimony, but relied upon Sutterlin's testimony and played the video to demonstrate that the officers conspired to falsify their police reports and falsely swore that Jeter attempted to grab Courter's weapon and assaulted Trinidad.

Sufficient credible evidence was presented to prove Trinidad's guilt beyond a reasonable doubt that was untainted by Cofone's lay opinion and did not exacerbate any potential prejudice from its admission. Cofone's testimony was based on his perception of the video and served to advise the jury of the context in which he performed a further investigation. Even if Cofone's testimony included an inadmissible opinion regarding what he suspected, it was not capable of leading the jury to either an unjust result or one it otherwise would not have reached, as there was other sufficient evidence showing Trinidad assaulted Jeter without provocation and falsified his report.

III.

25

Judge Ravin sentenced Trinidad on count two (second-degree official misconduct) to a five-year term of imprisonment with five years of parole ineligibility. Trinidad contends in Point III that Judge Ravin erred in failing to sentence him one-degree lower to third-degree official misconduct and imposing a period of parole ineligibility.

We review a judge's sentencing decision under an abuse of discretion standard. State v. Fuentes, 217 N.J. 57, 70 (2014). As directed by the Court, we must determine whether:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

We discern no abuse of discretion in Trinidad's sentence.

### A.

Trinidad first argues that Judge Ravin erred by not sentencing him one-degree lower to third-degree official misconduct because the mitigating factors substantially outweighed the aggravating factors, he acted under provocation and stress and out of character, and he reasonably believed his life was in danger.

Sentencing a first- or second-degree offender to a sentence one degree lower is governed by N.J.S.A. 2C:44-1(f)(2), which provides:

> In cases of convictions for crimes of the first or second degree where the court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands, the court may sentence the defendant to a term appropriate to a crime of one degree lower than that of the crime for which he was convicted.

The statute thus establishes a two-prong test. State v. Megargel, 143 N.J. 484, 496 (1996). "The court must be 'clearly convinced that the mitigating factors substantially outweigh the aggravating ones and that the interest of justice demands a downgraded sentence.'" Ibid. (quoting N.J.S.A. 2C:44-1(f)(2)).

"[T]he standard governing downgrading is high." Id. at 500. First, "a court must apply the basic [sentencing] principles that are applicable to all sentencing decisions under the Code." Ibid. Paramount is the requirement that the severity of the crime is "the most single important factor in the sentencing process." Ibid. (citing State v. Hodge, 95 N.J. 369, 379 (1984)). As the Court stated:

> In evaluating the severity of the crime, the trial court must consider the nature of and the relevant circumstances pertaining to the offense. . . . The surrounding circumstances of an offense may make it very similar to a lower degree offense, thus suggesting that a downgraded sentence may be appropriate.

27

[Id. at 500.]

Nonetheless, "facts personal to the defendant may be considered in the sentencing process." Id. at 501 (citation omitted). Deterrence is "one of the most important factors in sentencing." Ibid.

> Courts should consider a defendant's role in the incident to determine the need to deter him from further crimes and the corresponding need to protect the public from him. Was the defendant the mastermind, a loyal follower, an accomplice whose shared intent is problematic, or an individual who is mentally incapable of forming the necessary criminal intent?

> [Ibid.]

Second, a sentencing judge must consider the interest of justice. A decision to downgrade "should be limited to those circumstances in which defendant can provide 'compelling' reasons for the downgrade." Id. at 502 (citation omitted). Such "reasons must be in addition to, and separate from, the 'mitigating factors which substantially outweigh the aggravating factors" as found "under the first prong." Ibid. Because the "interest of justice" focuses on the offense and not the offender, the "circumstances used as compelling reasons for a downgrade should arise from within the context of the offense itself." State v. Lake, 408 N.J. Super. 313, 326 (App. Div. 2009).

28

For example, in <u>Lake</u>, we reversed the judge's decision to impose a third-degree sentence on a defendant convicted of second-degree official misconduct. 408 N.J. Super. at 330. We noted that in justifying the downgrade, the trial judge improperly relied upon "circumstances such as a defendant's overall character or contributions to the community [which] should not be considered under the interest of justice prong in the determination of whether or not to downgrade a sentence pursuant to N.J.S.A. 2C:44-1f(2)." <u>Id.</u> at 328.

Finally, after identifying the sentencing factors, the sentencing judge must describe how, in the exercise of discretion, he balanced those factors. <u>Megargel</u>, 143 N.J. at 501-02.

Judge Ravin found that mitigating factor N.J.S.A. 2C:44-1(b)(7), "[t]he defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense[,]" applied "based on [Trinidad's] lack of criminal history and on the letters submitted on his behalf demonstrating he has led an exemplary and law-abiding life up until the date of this offense." The judge found that mitigating factor N.J.S.A. 2C:44-1(b)(8), "[t]he defendant's conduct was the result of circumstances unlikely to recur[,]" applied because Trinidad was

required to forfeit his position as a police officer as a result of the official misconduct conviction.

The judge applied mitigating factor N.J.S.A. 2C:44-1(b)(9),"[t]he character and attitude of the defendant indicate that he is unlikely to commit another offense[,]" based upon numerous letters of support which suggested that Trinidad was dedicated to his family, friends and community and extremely remorseful. The judge's findings on this mitigating factor is supported by sufficient credible evidence, consisting of twenty-eight character letters submitted by Trinidad's family members, friends, and employers, which the judge summarized on the record during the sentencing hearing.

Contrary to Trinidad's argument, Judge Ravin properly rejected mitigating factors N.J.S.A. 2C:44-1(b)(1), "[t]he defendant's conduct neither caused nor threatened serious harm[,] and N.J.S.A. 2C:44-1(b)(2), "[t]he defendant did not contemplate that his conduct would cause or threaten serious harm[,]" because Trinidad's conduct of punching Jeter and throwing him against his patrol vehicle threatened serious harm.

Judge Ravin also properly rejected mitigating factors N.J.S.A. 2C:44-1(b)(3), "[t]he defendant acted under a strong provocation[,]" and  N.J.S.A. 2C:44-1(b)(5), "[t]he victim of the defendant's conduct induced or facilitated its

commission." In finding Trinidad guilty on all counts, the jury evidently credited Jeter's version of events, that there was no provocation, over Trinidad's version.

Judge Ravin applied aggravating factor N.J.S.A. 2C:44-1(a)(9), "[t]he need for deterring the defendant and others from violating the law[,]" finding "imprisonment would further the goals of general deterrence for the serious crime of official misconduct." The Legislature's imposition of an enhanced penalty for the offense of second-degree official misconduct suggests it is a serious crime requiring general deterrence. N.J.S.A. 2C:43-6.5. Accordingly, the judge found three mitigating factors and only one aggravating factor, warranting the imposition of a custodial term at the low end of the sentencing range for a second-degree crime. See N.J.S.A. 2C:43-6(a) (stating "[i]n the case of a crime of the second degree, for a specific term of years which shall be fixed by the court and shall be between five years and [ten] years").

However, "[t]he factors are not interchangeable on a one-to-one basis," thereby, "[t]he proper weight to be given to each is a function of its gravity in relation to the severity of the offense." State v. Roth, 95 N.J. 334, 368 (1984). "The sentencing court does more than quantitatively compare the number of pertinent aggravating factors with the number of applicable mitigating factors;

<span>A-3029-15T3</span>

the relevant factors are qualitatively assessed and assigned appropriate weight in a case-specific balancing process." Fuentes, 217 N.J. at 72-73 (citations omitted). Thus, Judge Ravin's finding of three mitigating factors and only one aggravating factor does not necessarily constitute a finding that mitigating factors substantially outweighed the aggravating factors; a review of the sentencing transcript reveals that he made no such finding.

Moreover, Judge Ravin properly found Trinidad was not entitled to a downgraded sentence because he failed to satisfy the interests of justice standard. The judge recognized the severity of the offense and the need for deterrence given the mandatory minimum prison term and mandatory five-year parole disqualifier for second-degree official misconduct under N.J.S.A. 2C:43-6.5.

The judge also compared the second-degree official misconduct conviction to the elements of a third-degree official misconduct and properly found there was no similarity between Trinidad's conduct and third-degree official misconduct warranting a downgrade. A third-degree official misconduct offense occurs when "the benefit obtained or sought to be obtained, or of which another is deprived or sought to be deprived, is of a value of $200.00 or less[.]" N.J.S.A. 2C:30-2. Sufficient credible evidence in the record demonstrated that

the harm or benefit arising from the official misconduct was nonpecuniary. Jeter sustained various injuries, and he was indicted for various crimes he did not commit, including aggravated assault on a law enforcement officer, based on Trinidad's false report of the incident. Trinidad benefited by initially receiving an exoneration by IAD and retaining his employment with the BPD.

Judge Ravin properly found that Trinidad's role and the surrounding circumstances did not constitute compelling reasons to downgrade the sentence. The judge noted that Trinidad "smashed the front of Jeter's car, punched Jeter twice when he was outside the car on the ground, and then hit him again when he was up against the car, resulting in injuries to Jeter's arms, wrist, face[,] and ear." The judge also found that Trinidad "filled out his own report and swore under oath regarding the circumstances," which the jury found was untruthful when it convicted him of false swearing.

Lastly, contrary to Trinidad's contention that he was acting under immense stress and provocation due to which the interests of justice warrant a downgrade, Judge Ravin found that in finding him guilty on all counts, the jury evidently found there was no provocation, and the video recording from Trinidad's patrol vehicle and Jeter's and Sutterlin's testimony supported these findings. Thus,

33

sufficient credible evidence supported Judge Ravin's finding that the interests of justice did not warrant a downgrade.

B.

Judge Ravin found that because Trinidad did not satisfy the severe hardship standard, he must serve both a prison sentence and parole ineligibility term. Trinidad argues that Judge Ravin erred by imposing a period of parole ineligibility because the mitigating factors substantially outweighed the aggravating factors, his character warranted waiver of the mandatory minimum sentence, and he acted on knowledge he gained from the other officers. He further argues that Judge Ravin erred by not considering Jeter's conduct and the need for general deterrence was low because he suffered sufficient repercussions to specifically deter him from committing an offense.

N.J.S.A. 2C:43-6.5(a) requires the imposition of a mandatory five-year term of imprisonment without eligibility for parole for second-degree official misconduct. The court may waive or reduce the mandatory minimum term "[i]f the court finds by clear and convincing evidence that extraordinary circumstances exist such that imposition of a mandatory minimum term would be a serious injustice which overrides the need to deter such conduct in others[.]"

A-3029-15T3

N.J.S.A. 2C:43-6.5(c)(2). When the court waives or reduces the mandatory minimum sentence, it "must state with specificity its reasons" for doing so. Ibid.

In considering whether to waive or reduce a mandatory term under N.J.S.A. 2C:43-6.5(a), a court should engage in an analysis similar to the one required by N.J.S.A. 2C:44-1(d), which allows the court to waive a mandatory term for a first- or second-degree offender if it finds that in light of defendant's "character and condition," imprisonment would result in a serious injustice overriding the need of general deterrence. State v. Rice, 425 N.J. Super. 375, 386-87 (App. Div. 2012). The "serious injustice" standard contained in both statutes requires a showing of extraordinary and unanticipated circumstances. Id. at 386. "[Th]e reasons offered to dispel the presumption of imprisonment must be even more compelling than those that might warrant downgrading an offense." State v. Evers, 175 N.J. 355, 389 (2003).

In interpreting the "serious injustice" standard in N.J.S.A. 2C:44-1(d), the Court has advised that "a trial court should determine whether there is clear and convincing evidence that there are relevant mitigating factors present to an extraordinary degree and, if so, whether cumulatively, they so greatly exceed any aggravating factors that imprisonment would constitute a serious injustice overriding the need for deterrence." Id. at 393-94. The Court warned that "it is

the quality of the factor or factors and their uniqueness in the particular setting that matters." Ibid. With respect to deterrence, the trial court should consider the severity of the offense, along with the circumstances of the case, defendant's role in the offense, and any presumption of imprisonment. Id. at 394-95.

We have found that to apply the "serious injustice" standard in N.J.S.A. 2C:43-6.5(c)(2), the trial court should similarly determine "whether the 'extraordinary circumstances' presented by an individual defendant outweigh the legislative determination that the need to deter others from committing certain crimes 'involv[ing] or touch[ing] . . . [public] office or employment' requires imposition of the statutory mandatory minimum." Rice, 425 N.J. Super. at 389 (alterations in the original) (quoting N.J.S.A. 2C:43-6.5). It will be "justified only in 'the extraordinary or extremely unusual case where the human cost of imprisoning a defendant [for the statutory mandatory minimum and] for the sake of deterrence constitutes a serious injustice.'" Ibid. (alteration in the original) (quoting Evers, 175 N.J. at 392).

Judge Ravin did not abuse his discretion in imposing the five-year prison term and five-year period of parole ineligibility. His decision did not violate the sentencing guidelines or shock the judicial conscience and was based on findings of aggravating and mitigating factors that were supported by sufficient

credible evidence in the record. The judge properly found that Jeter's conduct, the consequences Trinidad faced as a result of his conviction, and Trinidad's character did not constitute "extraordinary circumstances" sufficient to overcome the need to deter others from committing the same offenses. Trinidad fails to provide any extraordinary and unanticipated circumstances that would result in a serious injustice if the court imposed a lesser sentence that would outweigh the need to deter others.

As previously stated, Judge Ravin found mitigating factors seven, eight, and nine, and aggravating factor nine, and made no finding that the mitigating factors substantially outweighed the aggravating factor. While Trinidad posed a low risk of re-offending because he is no longer a police officer, a risk that other police officers will commit the same offense still exists. Moreover, Trinidad played an active role in the incident, as Jeter's testimony and the video recording from Trinidad's patrol vehicle revealed that Trinidad rammed his patrol vehicle into the front of Jeter's vehicle, assaulted Jeter, and then later falsified his report by stating Jeter assaulted him, attempted to grab Courter's gun, and resisted arrest. Lastly, the Legislature's imposition of a mandatory minimum five-year term of imprisonment for a second-degree official misconduct conviction suggests it is a severe crime with a high need for

37

deterrence. See N.J.S.A. 2C:43-6.5; Megargel, 143 N.J. at 502; State v. Mirakaj, 268 N.J. Super. 48, 50-51 (App. Div. 1993).

The fact that Trinidad obtained knowledge of what occurred at Jeter's residence from other officers, that Sutterlin testified he did not pressure or direct him to include false information in his report, and there is a low need to deter him because he lost his job, do not amount to extraordinary circumstances resulting in serious injustice sufficient to outweigh the need to deter others from committing the same offense. Even if Trinidad learned of what transpired at Jeter's residence from other officers, a jury convicted him of falsely swearing to the events that occurred while Jeter was stopped on the Garden State Parkway South, not to what occurred at Jeter's residence. Even if Trinidad did not direct or pressure Sutterlin to falsify his report, he falsified his own report.

The fact that as a result of his arrest and conviction, Trinidad lost his job, incurred substantial debt, and lost his car and apartment also do not constitute extraordinary and unanticipated circumstances. A conviction for second-degree official misconduct carries a presumption of imprisonment. N.J.S.A. 2C:43-6.5. Moreover, N.J.S.A. 2C:51-2(a)(2) provides that

> [a] person holding any public office, position, or employment . . . under the government of this State or any agency . . . thereof, who is convicted of an offense shall forfeit such office, position or employment if . . .

> [h]e is convicted of an offense involving or touching such office, position or employment[.]

As such, these are all natural, reasonable consequences of a conviction for second-degree official misconduct, not extraordinary or unanticipated circumstances.

Because Trinidad failed to show extraordinary or unanticipated circumstances more compelling than those warranting a downgrade and sufficient to overcome the need to deter others, Judge Ravin properly imposed the mandatory minimum term of imprisonment and the five-year period of parole ineligibility.

Accordingly, we affirm Trinidad's sentence on count two. However, because we find the conviction on the underlying offenses should have merged with the official misconduct conviction, we remand for resentencing to merge counts one, three, four, and five with count two.

## IV.

In Point IV, Trinidad contends Judge Ravin erred in denying his motion for judgment of acquittal notwithstanding the verdict (n.o.v.). He argues there was insufficient evidence to support the guilty verdicts on the underlying charges of tampering with public records, falsifying or tampering with records,

false swearing, conspiracy to commit official misconduct, and official misconduct.

We use the same standard as the trial judge in reviewing a motion for judgment of acquittal at the close of the State's case. State v. Bunch, 180 N.J. 534, 548-49 (2004). We must determine

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [State v. Reyes, 50 N.J. 454, 459 (1967).]

Under Rule 3:18-1, the court "is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State." State v. Muniz, 150 N.J. Super. 436, 440 (App. Div. 1977). "If the evidence satisfies that standard, the motion must be denied." State v. Spivey, 179 N.J. 229, 236 (2004).

The standard for deciding a Rule 3:18-2 motion for judgment of acquittal n.o.v. is the same as that used to decide a motion for acquittal made at the end of the State's case. See State v. Brooks, 366 N.J. Super. 447, 453 (App. Div. 2004). On appeal, we apply the same standard. State v. Kittrell, 145 N.J. 112,

130 (1996). Applying these standards, we discern no reason to reverse the denial of Trinidad's motion for judgment of acquittal n.o.v.

Tampering With Public Records or Information

N.J.S.A. 2C:28-7(a), provides in pertinent part:

A person commits an offense if he:

(1) Knowingly makes a false entry in, or false alteration of, any record, document or thing belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government;

(2) Makes, presents, offers for filing, or uses any record, document or thing knowing it to be false, and with purpose that it be taken as a genuine part of information or records referred to in paragraph (1); or

(3) Purposely and unlawfully destroys, conceals, removes, mutilates, or otherwise impairs the verity or availability of any such record, document or thing.

Judge Ravin held the State presented sufficient evidence to enable a rational jury to find Trinidad and Courter guilty of this charge beyond a reasonable doubt. The judge found the third element was met because it was undisputed that the police reports and complaint warrants were public records required to be kept by the BPD. As to the first and second elements, the judge found it was within the jury's exclusive province to determine witness credibility and how much weight to give to the evidence. The judge pointed to Jeter's

41

testimony denying he eluded Courter, resisted arrest, attempted to disarm Courter, or assaulted Trinidad. The judge found the video recording from Courter's patrol vehicle corroborated Jeter's denial he eluded Courter, and based on the jury's viewing of this video recording, it could find Jeter's vehicle was not in Courter's line of vision, and therefore, Jeter was not aware he was being pursued until Courter activated his lights and sirens and Jeter immediately pulled over. The judge also found this video recording provided a basis for the jury to rationally find Jeter did not assault Trinidad in the manner Trinidad reported because neither Trinidad nor Sutterlin were seen entering the driver's compartment of Jeter's vehicle at the point where Jeter was being removed from the vehicle.

Judge Ravin found the video recording from Trinidad's patrol vehicle further corroborated Jeter's denials. The judge determined the jury could have found based on this video recording that Jeter's posture was submissive and his hands were up during the point when Courter was attempting to remove his seatbelt, despite the split second when one of Jeter's hands was down.

Judge Ravin also pointed to Sutterlin's testimony that: Trinidad and Courter together helped him write his incident report; his report was false; he did not see Jeter grab Courter's gun; he, Trinidad and Courter did not struggle

42

to remove Jeter's hands from Courter's gun; he did not see Jeter strike Trinidad; and he and Trinidad never entered the passenger compartment of Jeter's vehicle.

Judge Ravin concluded a rational jury could have found Jeter's testimony credible and interpreted the two video recordings as corroborating his testimony. The judge determined based on this evidence, a rational jury could find Trinidad and Courter knowingly submitted false reports and complaint warrants regarding Jeter's actions during the incident giving rise to the criminal charges. The judge noted that Courter's false entries included that: Jeter eluded him, refused to show his hands and grabbed his holster to get his handgun; Trinidad and Sutterlin came to his aid by entering the driver's compartment of Jeter's vehicle and restraining Jeter's hands from removing his handgun; Jeter punched Trinidad in the face as they attempted to take Jeter to the ground; and Jeter committed the criminal offenses for which he was charged.

Judge Ravin noted that Trinidad's false entries included that: he saw Jeter grabbing Courter's handgun; he and Sutterlin grabbed Jeter's hands off Courter's gun; Jeter struck him with a closed fist while attempting to extract Jeter from his vehicle; and Jeter committed the offenses charged in the complaint warrants.

<u>Falsifying or Tampering with Records</u>

N.J.S.A. 2C:21-4(a), provides in pertinent part, that "a person commits a crime of the fourth degree if he falsifies, destroys, removes, conceals any writing or record, or utters any writing or record knowing that it contains a false statement or information, with purpose to deceive or injure anyone or to conceal any wrongdoing."

For the same reasons Judge Ravin expressed for the tampering with public records or information charge, he held that the State presented sufficient evidence to allow a rational jury to conclude Trinidad and Courter submitted false statements in their documents pertaining to Jeter's arrest. As for the second element, the judge found that Jeter's and Sutterlin's testimony and the two video recordings were sufficient to allow a rational jury to infer Trinidad and Courter wanted to injure Jeter out of anger and deceive the BPD, or alternatively, sought to conceal their own wrongdoings in connection with Jeter's arrest.

<u>False Swearing</u>

N.J.S.A. 2C:28-2(a) provides, in pertinent part, that "[a] person who makes a false statement under oath or equivalent affirmation, or swears or affirms the truth of such a statement previously made, when he does not believe the statement to be true, is guilty of a crime of the fourth degree." "To establish a defendant's guilt under N.J.S.A. 2C:28-2a, the State must prove that a

44

particular statement was false and not believed by the defendant to be true." State v. Bzura, 261 N.J. Super. 602, 610 (App. Div. 1993). To be convicted under N.J.S.A. 2C:28-2(a), "the false swearing [must be] willful and intentional." State v. Angelo's Motor Sales, Inc., 125 N.J. Super. 200, 206 (App. Div. 1973) (holding that to be convicted under N.J.S.A. 2C:28-2(a), "the false swearing [must be] willful and intentional").

Judge Ravin found the State presented sufficient evidence to enable a rational jury to find Trinidad and Courter knowingly committed the act of false swearing. The judge found it was undisputed that they certified under oath that the charges against Jeter were true. The judge also found that a rational jury could have inferred from Jeter's testimony that he did not commit the offenses, from Sutterlin's testimony that Trinidad and Courter told him what to write in his reports, and that Trinidad and Courter knowingly made false statements under oath.

Official Misconduct

N.J.S.A. 2C:30-2 provides, in pertinent part:

> A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:
>
> > a. He commits an act relating to his office but constituting an unauthorized exercise of his

45

official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner[.]

"Benefit means a gain or advantage, or anything regarded by the beneficiary as a gain or advantage, including a pecuniary benefit or a benefit to any other person or entity in whose welfare he/she is interested." Model Jury Charges (Criminal), "Official Misconduct (N.J.S.A. 2C:30-2)" (2006); see also N.J.S.A. 2C:27-1; State v. Quezada, 402 N.J. Super. 277, 285 (App. Div. 2008). The benefit does not have to be pecuniary, but could amount to enjoyment or self-gratification. Quezada, 402 N.J. Super. at 285.

Judge Ravin found it was undisputed Trinidad and Courter were public servants who were acting in their official capacity as police officers at the time of the incident. The judge found based on his analysis regarding the tampering with public records or information, falsifying or tampering with records and false swearing counts, each of which constituted the predicate unauthorized official act for official misconduct, that a rational jury could infer Trinidad and Courter knowingly committed a violation of official duty.

Judge Ravin also found the State presented sufficient evidence that Jeter was injured and Trinidad's and Courter's reports were inconsistent with the two video recordings from which a rational jury could conclude Trinidad and Courter

46

sought the benefit of concealing their actions during the incident from departmental review in order to make their actions appear correct.

Conspiracy to Commit Official Misconduct

N.J.S.A. 2C:5-2 provides, in pertinent part:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:
>
> (1)    Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2)    Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

"[T]he agreement to commit a specific crime is at the heart of a conspiracy charge." State v. Samuels, 189 N.J. 236, 245 (2007). "It is the agreement that is pivotal." Id. at 246.

"A conspiracy conviction does not turn on 'doing the act, nor effecting the purpose for which the conspiracy is formed, nor in attempting to do them, nor in inciting others to do them, but in the forming of the scheme or agreement[.]" State v. Ball, 141 N.J. 142, 178 (1995) (alteration in original) (quoting State v. Carbone, 10 N.J. 329, 337 (1952)).  Likewise, "mere knowledge, acquiescence, or approval of the substantive offense without an agreement to cooperate, is not

enough to establish one as a participant in a conspiracy." State v. Abrams, 256 N.J. Super. 390, 410 (App. Div. 1992). "It is the agreement that is pivotal." Samuels, 189 N.J. at 246.

In determining whether the scheme or agreement was formed, "[j]uries are routinely instructed that they may draw logical inferences from the evidence presented to them and that circumstantial evidence is of as equal weight as direct evidence. Courts have regularly held that conspiracy may be proven through circumstantial evidence." State v. Cagno, 211 N.J. 488, 512 (2012). However, "[t]here must be intentional participation with the purpose of furthering the goal of committing the crime." Cannel, New Jersey Criminal Code Annotated, cmt. 5 on N.J.S.A. 2C:5-2 (2010). Further, the essential elements of conspiracy must be evaluated in terms of the underlying offense. Samuels, 189 N.J. at 246-47.

Judge Ravin found the evidence established that Trinidad, Courter and Sutterlin were working together in close proximity to each other and Jeter at the scene of the incident, and the officers got together and spoke about what information to include in their reports. The judge noted the striking similarity of the facts in the officers' reports and the video recordings that contradicted the contents of those reports. The judge also noted that while Sutterlin testified that Trinidad and Courter did not orchestrate his report, he also testified they

refreshed his recollection as to the incident. The judge concluded that based on Trinidad's and Courter's communications with Sutterlin, the similarity of their reports, and the video evidence contradicting the reports, a rational jury could infer Trinidad and Courter knowingly prepared false reports and helped Sutterlin prepare a false report for the purpose of committing official misconduct.

We are satisfied that the overwhelming evidence in this case, viewed in its entirety and giving the State all favorable inferences therefrom, was more than sufficient to allow a reasonable jury to find Trinidad guilty of tampering with public records, falsifying or tampering with records, false swearing, official misconduct, and conspiracy to commit official misconduct beyond a reasonable. We have considered Trinidad's arguments to the contrary in light of the record and applicable legal principles and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). We affirm the denial of Trinidad's motion for judgment of acquittal n.o.v. substantially for the reasons Judge Ravin expressed in his comprehensive and cogent written opinion.

Trinidad's conviction and sentence on count two are affirmed. This matter is remanded for resentencing to merge counts one, three, four, and five with count two.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION